*Carlos Castro v. State of Arizona, et al.*
**USDC 2:18-cv-00753-SRB (ESW)**

**State Defendants' Statement of Facts in
Support of Their Motion for Summary Judgment**

### TABLE OF EXHIBITS

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| A | Deposition (in part) of Brad Martin taken on September 27, 2018 |
| B | Deposition (in part) of Carlos Ramon Castro taken on August 5, 2019 |
| C | Deposition (in part) of Ashley Selena Benton taken on August 1, 2019 |
| D | Plaintiff's Responses to Defendant's Requests for Admission dated March 6, 2019 |
| E | Declaration of Jeremy Horn, pertaining to Exhibits F and G |
| F | Police Body Camera Video |
| G | Thirty (30) Still Images from Police Body Camera Video |
| H | Declaration of Detective K.C. Hill |
| I | Declaration of Detective Tate Headley |
| J | Declaration of Trooper Matthew Engwis |

8239245


**EXHIBIT A**



COURT REPORTING

LEGAL VIDEOGRAPHY

VIDEOCONFERENCING

TRIAL PRESENTATION

MOCK JURY SERVICES

LEGAL TRANSCRIPTION

COPYING AND SCANNING

LANGUAGE INTERPRETERS



NAEGELI
Expect Excellence

DEPOSITION AND TRIAL

CELEBRATING
35
YEARS IN BUSINESS

(800) 528-3335

NAEGELIUSA.COM

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

CARLOS CASTRO,

    Plaintiff,

vs                          CASE NO. 2:18-cv-00753-SRB

THE STATE OF ARIZONA, ET AL.,

    Defendants.

_____

**DEPOSITION OF**

**BRAD MARTIN**

**TAKEN ON**
**TUESDAY, SEPTEMBER 27, 2018**
**9:01 A.M.**

**PLAZA EXECUTIVE SUITES**
**2942 NORTH 24TH STREET, SUITE 114**
**PHOENIX, ARIZONA 85016**

1  Glendale police officer that was disclosed by the

2  City of Glendale.

3          Did you review both of those or just one

4  or the other?

5      A.   Both.

6      Q.   And have you had a chance to review any

7  photographs of any injuries to Carlos Castro?

8      A.   Yes.

9      Q.   Now, let's just start and talk a little

10 bit about your background and training.

11     A.   Okay.

12     Q.   Can you tell me -- give me just a brief

13 history of your employment with Arizona Department

14 of Public Safety?

15     A.   When you say brief, I guess you're saying

16 towards my canine experience or every experience

17 I've had throughout the whole agency?

18     Q.   I'll just ask some more specific

19 questions.

20          How long have you worked for DPS?

21     A.   Eleven years.

22     Q.   Did you work for any other law enforcement

23 agencies before that?

24     A.   Yes.

25     Q.   And which ones?



```
 1      A.    I worked in Michigan for the Ingham County
 2  Sheriff's Office for 11 years.
 3      Q.    Any military experience?
 4      A.    No.
 5      Q.    Did you say Ingham?
 6      A.    Yes.
 7      Q.    With that sheriff's department, did you --
 8            MR. SCHEPLER:  I'm terribly sorry, Scott.
 9            THE WITNESS:  Interesting music.
10            MR. EWING:  That's okay.
11            THE WITNESS:  How do you type that on
12  there?
13            MR. SCHEPLER:  Sorry.
14  BY MR. EWING:
15      Q.    Were you a canine handler with the Ingham
16  Sheriff's Department?
17      A.    Yes.
18      Q.    How many years were you a canine handler?
19      A.    Six years.
20      Q.    How many separate canines did you use when
21  you were with that department?
22      A.    Just one.
23      Q.    What was the breed of that canine?
24      A.    German Shepherd.
25      Q.    Now, when you came to Arizona Department
```



1  of Public Safety and started working for them, were

2  you a canine handler right away --

3       A.    No.

4       Q.    -- when you first started?

5       A.    No.

6       Q.    And how long ago did you start working as

7  a canine handler for DPS?

8       A.    January of 2016.

9       Q.    And are you still currently a canine

10 handler?

11      A.    Yes.

12      Q.    And your canine's name was Storm, right?

13      A.    Correct.

14      Q.    And have you had more than one canine with

15 DPS?

16      A.    No.

17      Q.    And what breed of dog is Storm?

18      A.    He's a Belgian Shepherd.  It's a Malinois

19 -- Belgian Malinois and the German Shepherd bred

20 together so you get the Belgian Shepherd.

21      Q.    And did you undergo training while at DPS

22 related to being a canine handler?

23      A.    Yes.

24      Q.    And was that training -- where was that

25 training?



1       A.    So department or outside -- there's been

2   outside training too as well.  So you're asking me

3   right now just specifically through DPS where the

4   training has been?

5       Q.    **Let me ask about both.  Did you do**

6   **training at Adlerhorst?**

7       A.    Yes.

8       Q.    **And what did that training involve?**

9       A.    The training at Adlerhorst that we've been

10  to as far as selection of the dogs, looking at the

11  different types of dogs there and also a decoy

12  school.

13      Q.    **What is a decoy school?**

14      A.    Decoy school is an individual that you

15  have that will put on the bite suit or a bite sleeve

16  that you'll see, hence the decoy.  We call him the

17  decoy. You hide from the canine, and the canine will

18  locate you.  That is the decoy.

19            So the school goes in depth and detail of

20  how to work the dogs, how to read the dogs, to learn

21  more about the dogs, to not injure the dogs.

22      Q.    **Can you estimate -- and if this is too**

23  **difficult to estimate, that's okay.**

24            **Since you started as a canine handler at**

25  **DPS, approximately how many deployments of Storm**

1   have you undertaken?

2      A.   Hundreds.  Over hundreds.  I know that.

3      Q.   And of those deployments, how many --

4   again, approximately, you know, within a dozen or

5   so, how many have resulted in a bite?

6      A.   Two.

7      Q.   When recalling Storm are you -- is Storm

8   certified to respond to a verbal out?

9          MS. ELLIOT:  Form.

10         THE WITNESS:  So when you say that, I

11  guess it -- I'm not understanding your question

12  because it makes a huge difference as far as how

13  you're asking me the question.

14  BY MR. EWING:

15     Q.   I'm just trying to ask how once Storm has

16  -- so Storm is trained upon command to bite a

17  suspect; is that correct?

18     A.   Yes.  Correct.

19     Q.   And at some point when you determine that

20  you don't want Storm to bite the suspect anymore,

21  you would, as I understand it, take some action to

22  out the dog or get the dog off the bite.

23         Am I using incorrect terminology when I

24  say out the dog?

25     A.   You're correct.  I could go on about

1  terminology all day long about that.  But getting

2  the dog to release would be the correct term, to

3  release from the bite.  So when you -- if you're

4  asking me how do I get Storm to release from a bite

5  -- is that what your question is?

6      **Q.  Yes, it is.**

7      A.   So you can have release -- it's two

8  different ways.  It all comes through with a verbal

9  out, verbal release with one command.

10      **Q.  So there is a verbal out that you can use**

11  **to have Storm release from the bite; is that**

12  **correct?**

13      A.   Yes.

14      **Q.  I'm not going to ask what it is.  I**

15  **realize these are confidential commands.**

16          **And is Storm certified to respond to a**

17  **verbal out in order to get him or her to release**

18  **from the bite?**

19       **MS. ELLIOT:**  Form.

20       **THE WITNESS:**  So to answer your question,

21  yes.  He was the top scoring KNPV dog, which he

22  scored honors in the Netherlands and Holland.  He's

23  proven time and time again through training at DPS

24  and other schools and through certifications that he

25  can verbally out from a bite two different ways.

1         We grab ahold of the dog, control the

2    dog's neck.  We give them the release command, and

3    we hold onto their neck and take them back to avoid

4    any further bites and more injuries to the suspect.

5        **Q.    So March 10th to March 11th -- because it**

6    **was around midnight -- 2017 was the time period that**

7    **Carlos Castro was arrested, and those are the events**

8    **that gave rise to this litigation.**

9        **Do you have some independent recollection**

10   **of that evening/early morning?**

11       A.    Yes.

12       **Q.    I'm going to talk now and ask a few**

13   **questions and just ask you to kind of go through**

14   **what you remember and what happened.**

15       A.    Okay.

16       **Q.    Let's start -- you know, eventually you**

17   **get to the house where he was on the roof and he was**

18   **apprehended, but let's back up a little bit from**

19   **there.**

20       **When do you -- when were you called into**

21   **this situation, if you can recall?**

22       A.    It had been hours before we actually had

23   made contact.  We go over what's called a briefing.

24   We were briefed on the incident, what's occurring

25   with the search warrant.  The search warrant has to

1  be reviewed.  The command officers review the search

2  warrant and make sure it's valid.  And then the case

3  detectives will tell us the suspect's background and

4  history and the violence potential before we go into

5  the house.

6      **Q.    And what do you -- what did they tell you**

7  **about the suspect's violence potential?**

8      A.   He had been in prison for aggravated

9  assault. He had weapons offenses.  He was a

10 documented Dogtown gang member.  He was a prohibited

11 possessor.  He had done a drive-by shooting.  What

12 else?

13         He had burglary charges on his history. He

14 had been in prison several times.  He had committed

15 aggravated assault on a security guard.  He had a

16 strong armed robbery of a security guard.  I'm

17 trying to think.  Theft of means he had on his

18 record.  He was in and out of prison, I believe,

19 twice, if I remember correctly.

20         So the violence potential was way up there

21 for us knowing that there was a weapon involved,

22 that he had committed a drive-by shooting, and the

23 day of the search warrant he actually committed the

24 aggravated assault on the security guard and the

25 strong armed robbery.

1          The detectives advised that during the

2   drive-by shooting that they did locate a handgun.

3   There was a handgun that he had used in the

4   incident.

5          So obviously with his violence potential,

6   gang member history, prison time and weapons

7   offenses, you know, that changed our -- where we

8   needed to be with our officers as well as threat

9   potential.

10     **Q.   And so when you arrived at the house where**

11  **he was eventually located crouched on the edge of**

12  **the roof there, you were -- were you partnered with**

13  **anybody?**

14          **MS. ELLIOT:**   Form.

15          **THE WITNESS:**   We're all together as a

16  team.   And basically as a canine, you have officers

17  there to protect you because obviously I'm

18  controlling the canine.

19  **BY MR. EWING:**

20     **Q.   And so you were all there as a team.   Who**

21  **else was there that you can remember by name?**

22     A.    There's 20-some guys that were there.   I

23  don't know all of them.   I can tell you the people

24  that were involved as far as the cover with me.   Do

25  you want me to try to tell you everybody I know that

1        At that point we gave the commands in the

2    backyard.  We waited to see if we would get a

3    response from Castro.  He still didn't respond

4    saying, "I'm in the backyard and I give up."  So we

5    sent Storm in the backyard.

6        Storm ran immediately under the tree that

7    Castro was climbing up in.  The helicopter at that

8    point lit Storm up with the spotlight.  He ran

9    higher up into the tree.  At that point as he was

10   doing that, I gave him two more commands to stop

11   from about 15 yards away.  He still continued to

12   flee.

13       At that point he jumped on the roof of the

14   residence and ran to the front of the residence. At

15   that point we had to come from the backside of the

16   residence with myself and the detectives that were

17   with me and approached the front of the residence.

18       At which time there was Glendale and some

19   other SWAT detectives that were there in front of

20   the residence.

21       At that point Castro ran from the rear of

22   the residence to the front, got himself in a

23   crouched position.  At that point detectives were

24   yelling at him to come off from the roof.  Castro

25   would put his hands up, and then he'd put his hands

1  down.  He'd say, "I'm done," and then he'd put his

2  hands back down.

3        Someone called -- I believe it was

4  Sergeant Brooks called for less lethal to get him to

5  come off the roof because he wasn't complying.

6        At that point the Glendale detective tased

7  him after he advised that he was going to tase him.

8  So he tased him.  The Taser was ineffective. Castro,

9  once again, said, "I'm done, I'm done."  He had his

10 hands up, and then he would put his hands back down.

11       So the first Taser deployment was

12 ineffective so the Glendale officer tased him again.

13 The second Taser deployment was ineffective.  At

14 that point suspect Castro put his hands down and

15 said, "I'm done."  He got himself to the edge of the

16 roof, and he pushed himself down off the edge of the

17 roof.

18       He came off the roof of the house and

19 landed on his feet.  He was still on his feet.  At

20 which time Detective Headley tackled him along with

21 Detective Engwis.  I believe it was Detective Engwis

22 and Detective Headley that had his arms, had him on

23 the ground.

24       Castro continued to fight.  At which point

25 there was two -- Castro took his left and right arms

1  and put them underneath his waistband area. Still at

2  that point we're thinking that he was armed with the

3  handgun because he had already committed a drive-by

4  shooting, aggravated assaults with a weapon, prior

5  history of violent tendencies.  We still believed

6  that he was armed with a gun at that point. We did

7  not know because he had not been searched yet.

8          So at that point with his arms locked

9  underneath his waistband area, we didn't know if he

10  was going for a handgun or whether he was just

11  fighting and resisting.  So those two detectives

12  were unable to secure Castro, and then Sergeant

13  Brooks got in there to assist as well.

14          At that point we had three detectives and

15  still were unable to secure Castro and place him in

16  cuffs.  At that point another detective got into it.

17  Charlie Hopkins got into it as well.  So there was

18  four detectives that are on top of Castro as he was

19  still resisting arrest.  Detective Engwis was

20  telling him to stop fighting, stop resisting.  He

21  had his hands still locked underneath his waistband

22  area.

23          At that point he started kicking in a

24  backwards motion.  He was kicking with his legs,

25  kicking back towards where Storm and I's position

1  was.  Storm and I were still observing at that point

2  to see if they were going to be able to restrain

3  Castro, which they were unable to.

4         So as they were still unable to restrain

5  Castro, he started kicking at that point.  That's

6  the point in time that I chose the determination to

7  use Storm as a pain compliant tool to gain

8  compliance on Castro.

9         At that time Storm bit his left shin and

10  calf area of Castro's leg.  At that point Engwis,

11  once again, told him to stop kicking, stop fighting.

12  Castro continued to kick at Storm.  He was actually

13  kicking him with his right leg, and he was striking

14  Storm.  He continued to kick.

15         And then all of a sudden a -- you will see

16  it on the video.  You actually see a trooper at that

17  point as Castro says -- he's yelling and screaming,

18  and then you see the trooper actually take off the

19  flex cuffs from his back pouch.

20         At that point after Storm has been on the

21  bite, Castro finally starts to give up.  They were

22  able to pull his arms from underneath his waistband

23  and then place him in flex cuffs.

24         As he was placed in flex cuffs, I went up

25  to Storm, grabbed ahold of him and, once again, gave

1  him the hard out by grabbing ahold of him and then

2  gave him the verbal command to release from the

3  bite. This is after he was already placed in flex

4  cuffs to secure him.

5       After that he was secured.  He remained on

6  the ground for just a second as the paramedic and

7  the doctor were waiting.  Then he was taken to --

8  ten feet away or so, and that's when I exited from

9  the scene.  The doctors at that point gave Castro

10  treatment.

11  **BY MR. EWING:**

12  **    Q.   Okay.  When you were standing by with**

13  **Storm but before you deployed Storm to bite Castro,**

14  **do you remember which officers were standing near**

15  **you?**

16       A.   No.  I know the ones that were on top of

17  him that were fighting with him, but I do not know

18  the ones that were standing around.  I know Casey

19  Hill was with his dog.  Detective Hill was with his

20  dog, but they were kind of on the other side of us.

21  It was a mixture of officers that were there.

22  **    Q.   And in the bodycam video it appears at one**

23  **point that an officer reaches out and grabs Carlos**

24  **Castro's foot just before Storm bites his leg.**

25  **         Do you know who that officer is?**

1      A.    A Glendale canine officer approached me

2  after the incident was over and said that he had

3  grabbed his leg.

4      Q.    Which officer was that?

5      A.    I don't know.

6      Q.    But it was a Glendale canine officer?

7      A.    Correct.

8      Q.    Do you remember approximately how long

9  Storm was on the bite or was biting Carlos Castro?

10      A.    I don't know.

11      Q.    Was there any point where you took Storm

12  off or had Storm release from Carlos Castro and then

13  put him back on?

14      A.    No.

15      Q.    It appears from the injuries -- from the

16  photos of the injuries provided by the State of

17  Arizona that there's an injury at the front of his

18  leg on the shin and an injury at the back of his leg

19  -- a bite injury at the back of his leg on the calf.

20            How would that happen if Storm were not

21  taken off the bite and put back on?

22      A.    Because you're -- Carlos Castro was

23  fighting. He was kicking Storm.  So Storm through

24  his training will bite and he'll hold -- the dogs

25  are taught to bite and hold on so we don't have

1    Q.    What is that?  What constitutes aggression

2    training?

3    A.    When you say aggression training, it can

4    either be -- it's through several different ways.

5    It can be through a muzzle.  A lot of the work we do

6    with the dogs we don't actually really let them bite

7    because these dogs -- most of these dogs go their

8    whole career without even biting anybody.

9         The biting as far as suspects on the

10   street -- the street bites are very, very rare.

11   Storm, for instance, has had over a hundred

12   deployments with only two bites.

13        So the aggression training is -- most of

14   the time what we do with the dog is we'll actually

15   put them in a muzzle so the dog is unable to bite,

16   but the dog is still able to locate a decoy that's

17   hiding in a room without biting them.

18   Q.    Is Storm given a certain score during each

19   training?

20   A.    So not through each training.  Now, his

21   evaluations each year where he's evaluated through

22   Adlerhorst, then he is given scores, yes.

23   Q.    On average what scores does he receive?

24   A.    Excellent.  You can go down the line of

25   like obedience, listening to commands and stuff and

1  if you look at his paperwork and stuff like that all

2  of his scores are actually way above.  They're

3  excellent. Again, like I said, through the trials he

4  scored with honors which was -- once again, not to

5  brag anything I've done in particular.  It's all

6  him.

7      Q.    Are you also required to be certified by

8  Adlerhorst every year?

9      A.    Yes.  So we're a team.  The canine handler

10  has to be reviewed and looked at from Adlerhorst and

11  also from the agency.  For instance, if Brad Martin

12  was unable to control Storm, they wouldn't let me

13  keep Storm.

14         Obviously, they can't have the liability

15  of a dog that's out in the street where the handler

16  can't control the dog.  That's why it's constantly

17  that I'm evaluated and Storm is evaluated as well as

18  a team.

19      Q.    So have you been certified -- you and

20  Storm have been certified as a team every year that

21  you have worked together with DPS, correct?

22      A.    Yes.

23         MS. ELLIOT:  I'm going to mark this as

24  Exhibit 3.

25         (Deposition Exhibit No. 3 was marked for

1    Q.    You had mentioned attending a briefing

2    prior to arriving at the house where Castro was

3    eventually located, correct?

4    A.    Correct.

5    Q.    Do you remember who administered that

6    briefing?

7    A.    It would have been the Get 'Em detectives,

8    the task force detectives that were there.  I don't

9    remember who exactly did it, but it would be a

10   mixture of them.

11          And then it would be a mixture of our --

12   they're the crisis negotiators.  The negotiators do

13   workups of the residents who might be in the

14   residence and the suspect Carlos Castro.  When I say

15   a workup, they'll tell us all about his criminal

16   history and his violence potential.

17   Q.    And you previously testified about all of

18   the violence factors and safety factors that they

19   went over in that briefing, correct?

20   A.    Correct.

21   Q.    Were you aware that Castro had an

22   outstanding Department of Corrections warrant for

23   absconding from parole?

24   A.    Yes.  I knew that he had been in and out

25   of prison twice.  One was for aggravated assault and

NAEGELI
DEPOSITION AND TRIAL

(800)528-3335
NAEGELIUSA.COM

1  the other one was for theft of means and that he was

2  currently a parole absconder.  They told us that at

3  the briefing.

4      **Q.   Did you give verbal warnings to Castro**

5  **before you deployed Storm?**

6      A.   Yes.  So different locations, different

7  times of the deployment, but yes.

8      **Q.   Can you go through each location, time and**

9  **what warning was given?**

10     A.   Sure.  So the first canine deployment

11 announcement would have been inside of the residence

12 when Castro was running out the back of the

13 residence fleeing from us.  That was the first

14 canine deployment -- or first canine announcement.

15         I always give the canine announcement

16 twice.  So the canine announcement was twice.  And

17 then at that point the perimeter unit advised us

18 that Castro was fleeing from us out the back.  So

19 that was the first time.

20         The second time was in the backyard of the

21 residence.  Before I deployed Storm, I, once again,

22 gave the canine announcement twice with no response.

23         And then I gave it again at the pedestrian

24 gate of the backyard that Castro was located in.

25 So, once again, I gave the deployment command again

1  twice.  And then I actually gave it again when

2  Castro was jumping from the roof -- or from the tree

3  to the roof of the residence where he was later

4  observed.

5       Q.   **So you gave the canine warning seven**

6  **times?**

7       A.   Eight times.

8       Q.   **What is the exact warning that you give?**

9       A.   So the exact warning is this.  We say,

10  "State police canine."  So we tell the suspect who

11  we are, what our authority is.  So we say, "State

12  police canine."

13            Then we tell the suspect, "Come to the

14  sound of my voice now."  So what we won't tell the

15  suspect is what we -- we tell them our authority,

16  what we want them to do, and then we tell them

17  what's going to happen if they don't do what we want

18  them to do.

19            So then the last verbiage of it is, "Come

20  to the sound of my voice now.  If you do not, a

21  canine will be deployed and he will bite you."  So

22  we give that announcement twice.  So each location I

23  gave that announcement twice.

24       Q.   **What danger was presented to officers when**

25  **Castro was on the roof and would not obey commands**

1  **to come off the roof?**

2      A.    So at that point we're still -- we believe

3  that he was armed with a handgun.  So he had prior

4  aggravated assault charges, prior weapons offenses.

5  He had committed a drive-by shooting where he fired

6  rounds at individuals.  He committed a strong armed

7  robbery, and he committed an aggravated assault the

8  day of the incident.  So his violence potential was

9  very high.

10          So once he was up on that roof, we didn't

11  know whether he had a handgun or not.  He could have

12  easily pulled a handgun.  Most of the time these

13  gang members are -- they're not holding handguns on

14  a holster or anything like that.  They always have

15  them tucked in their waistband and down their

16  underwear or they have them on their ankles.

17          We didn't know if -- he hadn't been

18  searched yet.  We didn't know if he had a handgun on

19  his waistband or whether he had a handgun in his

20  ankle area.

21          So the threat to us was obviously he

22  easily could have shot numerous of us that were

23  standing right there.  So that's why us just

24  standing there -- we were in a very bad spot just to

25  stand there and not take action as far as deploying

1  a Taser or as far as getting him off the roof

2  somehow.

3       We're basically standing behind -- we're

4  basically targets at that point.  If he would have

5  had a handgun, he easily could have pulled it out of

6  his waistband or whatever area he had it and shot

7  numerous of us.

8  **Q.   In your experience what are some reasons**

9  **that a Taser might be ineffective on a suspect?**

10  A.   Lots of times what happens is one of two

11  things.  First, what you usually see is you have an

12  individual that's on -- high on drugs, a very strong

13  drug.  Methamphetamines or heroin are very strong

14  drugs where a suspect can work right through a Taser

15  deployment.  Mentally ill can work through Taser

16  deployments.

17       And then also another instance would be if

18  the Taser deployment was actually ineffective,

19  meaning -- so the probes are basically fishhooks.

20  So when they stick into your body, there has to be a

21  little bit of a distance there between probe one and

22  probe two to be effective on the body and to

23  actually lock the body up.

24  **Q.   Did you have any suspicions at the time**

25  **about why the Taser had been ineffective on Castro?**

1      A.    So at the time when we did the search

2  warrant throughout the residence, there was

3  suspected methamphetamine, which was tested later

4  and which was meth, inside the structure.  There was

5  marijuana that was tested and tested positive.

6  There was drug paraphernalia.

7           So when we're going through the residence,

8  we already knew his violence potential, number one.

9  And then we start thinking to ourself, okay, now we

10 have a suspect that just fled from us out the back.

11 He's a parole absconder known to carry a weapon.

12 There's suspected methamphetamine that's inside the

13 structure.

14          We think to ourselves, yeah, okay, if this

15 suspect is on, you know, methamphetamine too as

16 well, his strength and violence potential

17 expedientially goes up.

18          So thinking to myself on that, yeah, he

19 could easily be high on drugs, number one, that the

20 Taser deployment didn't work.  And then number two

21 would be is that both the probes didn't stick to him

22 or it was not a good deployment of a Taser on him.

23     Q.    **And these are thoughts you had at the**

24 **time?**

25     A.    Correct.  When I'm sitting back there as a

1  -- being a canine handler, you have to -- you're in

2  a position to kind of sit back lots of times and

3  review what's going on while other decisions are

4  being made. And then you're called up at that point

5  to be utilized as a locating tool or a force

6  multiplier in pain compliance.

7         So to answer you is I kind of -- I'm the

8  one that kind of usually sits back and kind of

9  observes what's going on and has the time to take it

10 in.

11    **Q.    When you testified earlier about Castro**

12 **resisting arrest, you noted that he had -- he was**

13 **face down on the ground and had put his hands, I**

14 **think you said, underneath him in his waistband; is**

15 **that accurate?**

16    A.    So at his waistband under -- his hands

17 were locked underneath his -- at his waistband area.

18    **Q.    When you say locked, what does that mean?**

19    A.    Basically if I was to take my left hand

20 and my right hand and lock them just like this right

21 now and lock my hands.

22    **Q.    Because the court reporter can't take down**

23 **what you're doing with your hands --**

24    A.    Sorry.

25    **Q.    -- you're kind of holding your hands,**

1  residence.  So all the ones that I observed -- I

2  can't remember how many there was, but they were all

3  just sitting right there with the detectives.

4      **Q.    In response to this incident a use of**

5  **force report was completed by your superiors,**

6  **correct?**

7      A.    I did the use of force form first and then

8  they review it.  I think what you're asking about is

9  the canine use of force.

10      **Q.    Yes, that's what I'm asking about.**

11      A.    The actual canine use of force is first

12  gone over by my supervisor -- my immediate

13  supervisor, which would have been Sergeant Powell.

14  Sergeant Powell reviews it, and then it goes to

15  Sergeant Green who is the training sergeant

16  coordinator.  He's the one that bought Storm and

17  also the one that actually sets up the training on a

18  weekly basis for us and keeps all the records.

19          Then what happens after he reviews it is

20  then it goes up to the canine captain.  The canine

21  captain reviews it and signs off on it, and then it

22  goes to, I believe, the lieutenant colonel or the

23  deputy director of the agency.

24      **Q.    What is the purpose of all these**

25  **individuals reviewing the report?**

1    A.    The purpose of all them reviewing the

2    report is to make sure that we all took proper

3    action and that I took proper action in the

4    utilization and the force that we used with the

5    canine using him as a pain compliant tool.

6            So they look at all the factors, our

7    department policy, case laws.  They look at all that

8    stuff and make sure what we did was -- that

9    everything followed our policies of our agency, case

10   laws and nothing was done wrong with the incident.

11   So they all review it to make sure that everything

12   is good to go and then sign off on it, approve it.

13       **Q.    What was the outcome of that review in**

14   **this case?**

15       A.    The outcome of the case is -- from

16   Sergeant Green's wording is that Detective Martin

17   followed all policies and procedures of the Arizona

18   Department of Public Safety and that he felt it was

19   necessary to deploy Storm in this matter and

20   actually cause less injuries to the public and also

21   to Castro too as well with the deployment of Storm.

22       **Q.    And was this same procedure followed after**

23   **the Matthews case?**

24       A.    Yes.

25       **Q.    What was the result of the inquiry in that**

1          On the night of this incident, he wasn't

2    going to give up.  All he was doing was looking for

3    another out.  When he was on the roof, he was just

4    stalling.  How do I figure out and catch my breath a

5    little bit?  What am I going to do next?  What's my

6    next move?

7          When he was on the ground, he still

8    continued to fight.  That's not a person that's

9    rational that just gives up.  So then basically it

10   ties our hands.  Especially me, you know, as a

11   canine handler it ties my hands.  I go, okay, well,

12   verbal commands have not worked for Carlos Castro.

13   Verbal commands, intermediate weapons have not

14   worked.  The Taser did not work.  Hand strikes did

15   not work.  More commands did not work.  Four big,

16   strong detectives couldn't even get his arms out

17   from underneath him.

18          So at that point what do we have left? We

19   have a dog.  Very ugly, but he was put in a

20   situation to control Castro.  The easiest way to say

21   this is that the suspect like Castro controls the

22   situation.

23          So if he would have given up, none of this

24   ever would have happened to begin with.  He never

25   would have been bit.  He never would have been



**EXHIBIT B**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Carlos Castro,                          )
                                        )
                 Plaintiff,             )
                                        )  Case No:
        - vs -                          )  2:18-cv-00753-SRB
                                        )  (ESW)
The State of Arizona, et al.,           )
                                        )
                 Defendants.            )
_____)

VIDEOTAPED DEPOSITION OF CARLOS RAMON CASTRO

Buckeye, Arizona
August 5, 2019
9:43 a.m.

Reported by:
Deborah Cleary, RPR/CR
Certified Reporter
Certification No. 50663

09:54:53  1      A.    No, I --

       2      Q.    -- incident?

09:54:55  3      A.    -- didn't.

09:54:55  4      Q.    You never received a citation or anything?

09:55:01  5      A.    No.

09:55:01  6      Q.    Okay.  And when was the next arrest?  And I

09:55:07  7  understand that these might be approximate dates.  I'm not

09:55:11  8  holding you to any dates, but approximately.

09:55:13  9      A.    Next probably -- I was like 18, when I turned 18.

09:55:16 10      Q.    And what was that for?

09:55:17 11      A.    Burglary, burglary tools.

09:55:22 12      Q.    And were you charged with anything in connection

09:55:28 13  with that arrest?

09:55:29 14      A.    Just whatever they got me with that day.

09:55:31 15      Q.    Were you convicted?

09:55:36 16      A.    I think, yeah, they put me on probation.

09:55:41 17      Q.    So you got probation for that one?

09:55:44 18      A.    Yes.

09:55:45 19      Q.    Okay.  When was the next arrest?

09:55:48 20      A.    When I came to prison -- no, I got caught with

09:55:56 21  marijuana.

09:55:58 22      Q.    Do you remember approximately when that was?

09:56:00 23      A.    I don't.  Around the same time as I had just

09:56:03 24  gotten out and got put on probation, and then I got

09:56:08 25  arrested again for the marijuana.

09:56:09  1        Q.    Okay.  And were you charged in connection with

09:56:12  2   that arrest?

09:56:12  3        A.    Yeah.

09:56:13  4        Q.    And were you convicted?

09:56:14  5        A.    Yeah.  They just reinstated my probation and ran

09:56:17  6   that with that.

09:56:18  7        Q.    Okay.  And when was your next arrest?

09:56:29  8        A.    When I came to prison my first time.

09:56:31  9        Q.    Approximately when was -- do you remember

09:56:34 10   approximately --

09:56:35 11        A.    2012.

09:56:36 12        Q.    -- when that was?  Okay.  And what was that

09:56:37 13   arrest for?

09:56:38 14        A.    Aggravated assault on a police officer and a

09:56:45 15   theft of means.

09:56:49 16        Q.    And let me go back a few.  The arrest for

09:56:53 17   burglary, was that -- was that charged as a felony, do you

09:56:59 18   know?

09:56:59 19        A.    I don't remember.  I think it was, yes.

09:57:03 20        Q.    And the 2012 aggravated assault and theft of --

09:57:10 21   did you say theft of --

         22        A.    Theft of means.

09:57:11 23        Q.    -- transportation means?

09:57:12 24        A.    Yeah.

09:57:12 25        Q.    Was that charged as a felony also?

09:57:14  1        A.    Yes.

09:57:14  2        Q.    And when was the next arrest?

09:57:24  3        A.    After that one, it was this, this time right

09:57:29  4   here.

09:57:30  5        Q.    For this incident?

09:57:31  6        A.    Yes.

09:57:31  7        Q.    So I understand that a number of the sentences

09:57:51  8   for those various charges ran concurrently.  Aside from

09:57:55  9   your current incarceration, have you been incarcerated

09:57:58 10   only one other time?

09:57:59 11        A.    Besides this one?

09:58:01 12        Q.    Yes.

09:58:02 13        A.    Yeah, just one other time.

09:58:03 14        Q.    Okay.  And so that was for multiple convictions;

09:58:07 15   correct?

09:58:07 16        A.    That was -- the only time I was incarcerated was

09:58:09 17   just for the aggravated assault and the theft of means.

09:58:13 18        Q.    Okay.  And how long was that period of

09:58:15 19   incarceration?

09:58:16 20        A.    They sentenced me -- my term?  It was --

09:58:20 21   sentenced me to five.  I ended up doing four and a half on

09:58:24 22   it.

09:58:24 23        Q.    Okay.  And when you were released after your

09:58:28 24   first period of incarceration, were you on parole?

09:58:32 25        A.    Yes.

10:01:00  1    basically the same thing, being out of place.

10:01:02  2        Q.   Anything else?

10:01:07  3        A.   No.

10:01:07  4        Q.   Sir, are you a member of a gang?

10:01:13  5        A.   Was.

10:01:14  6        Q.   Which one were you a member of?

10:01:16  7        A.   I live in Peoria.  It was a gang called Dog Town.

         8             THE COURT REPORTER:  A gang called?

         9             THE WITNESS:  Dog Town.

10:01:23 10    BY MS. ELLIOTT:

10:01:23 11        Q.   And you say you were?

10:01:25 12        A.   Yeah.

10:01:25 13        Q.   When did you cease being a member?

10:01:28 14        A.   I want to say probably when I -- my first time

10:01:33 15    out.  I didn't really associate with them no more, and I

10:01:37 16    just kept back from them so...

10:01:40 17        Q.   You said with your "first time out."

         18        A.   Yeah.

10:01:42 19        Q.   When was that?

10:01:42 20        A.   In 2016.

10:01:43 21        Q.   How does one stop associating with a gang?

10:01:54 22        A.   Stop going around where they're at.

10:01:58 23        Q.   So there's no -- you have no obligation to the

10:02:02 24    members of the gang?

10:02:03 25        A.   No.

10:02:04 1      Q.   You can just --

10:02:05 2      A.   Stop associating with them.  That's just what I

10:02:08 3   did.

10:02:08 4      Q.   So is it your testimony that you were not a

10:02:12 5   member of Peoria Dog Town on March 10th, 2017?

10:02:17 6      A.   No, I was not.

10:02:19 7      Q.   No, you were not?

10:02:20 8      A.   No.

10:02:20 9      Q.   Do you intend to be an active member again upon

10:02:31 10  your release?

10:02:32 11     A.   No.

10:02:32 12     Q.   Are you aware that in this case that the State

10:02:42 13  served you through your lawyer?  The State sent your

10:02:45 14  lawyer a document called a Request for Admission.  Are you

10:02:48 15  familiar with that?

10:02:48 16     A.   No.

10:02:49 17     Q.   The document had a series of questions and asked

10:02:56 18  you to either admit that they were true or deny that they

10:02:59 19  were true?

10:03:00 20     A.   Yeah.

10:03:00 21     Q.   Are you aware of any document like that that was

10:03:03 22  sent to your attorney?

10:03:04 23     A.   Not offhand I'm not.  But I'm pretty sure, yeah.

10:03:08 24  Yes, I think we --

10:03:09 25     Q.   Did you ever -- I'm sorry.

10:03:10  1        A.    I think, yes, we did deal with a paper like that.

10:03:13  2        Q.    Did you ever review your response to those

10:03:16  3   requests?

10:03:16  4        A.    No.  Lately?

10:03:19  5        Q.    Ever.

10:03:20  6        A.    Ever?  I don't remember.

10:03:26  7        Q.    So are you aware that in those requests you

10:03:32  8   admitted that on March 11th, 2017, you were a member of a

10:03:36  9   gang?

10:03:36 10        A.    I was.  I have been a member of a gang, but I'm

10:03:41 11   not no more.

10:03:41 12        Q.    I understand that.

10:03:43 13        A.    Yeah.

10:03:43 14        Q.    But the request that was made in this document

10:03:46 15   was to admit that on March 11th, 2017, you were a member

10:03:50 16   of a gang on that day; does that make sense?

10:03:53 17        A.    Yes.

10:03:53 18        Q.    And are you aware that you admitted that you in

10:03:56 19   fact were a member on that day of a gang?

10:03:59 20        A.    I don't recall but...

10:04:01 21        Q.    So is it your testimony now that you were not in

10:04:03 22   fact a member of a gang on March 11, 2017?

10:04:07 23        A.    Yes.

10:04:08 24        Q.    Okay.  So you are essentially changing your

10:04:12 25   response to a Request for Admission now here during your

10:04:15  1    deposition?

10:04:15  2         A.    Yes.

10:04:16  3         Q.    And I'm sorry to go back.  I just want to make

10:04:37  4    sure I'm clear.  So you're saying that you essentially

10:04:40  5    stopped being a member of Peoria Dog Town sometime in

10:04:43  6    2016?

10:04:44  7         A.    Yeah.  That's the time I stopped associating with

10:04:48  8    them, you mean.

10:04:48  9         Q.    Any of the other members have -- to your

10:04:51 10    knowledge, did any of the other members of the gang have

10:04:54 11    an issue with you not associating with them any more?

10:04:57 12         A.    No.

10:04:58 13         Q.    How long had you been a member of Dog Town?

10:05:04 14         A.    Since I was a kid.

10:05:05 15         Q.    How old were you when you were first initiated?

10:05:09 16         A.    14 years old, 15.

10:05:11 17         Q.    Do you have any knowledge of how many members Dog

10:05:19 18    Town has?

10:05:20 19         A.    No.

10:05:21 20         Q.    Is it like more than 100?

10:05:22 21         A.    I'd say around there.

10:05:23 22         Q.    Somewhere around 100?

10:05:25 23         A.    (Witness nods head.)

10:05:26 24         Q.    How did you become a member of Dog Town?

10:05:36 25         A.    I lived there my whole life.  It was just a part

10:05:39 1    of me right there.

10:05:40 2        Q.   Is there a specific initiation process?

10:05:43 3        A.   No.

10:05:44 4        Q.   So you just lived there your whole life, so you

10:05:48 5    kind of are grandfathered in sort of?

10:05:50 6        A.   Yes.

10:05:50 7        Q.   Does Dog Town have a particular territory?

10:05:55 8        A.   No, not really.  Just right there where I lived

10:06:00 9    was 83rd and Peoria, so that's about it right there.

10:06:03 10       Q.   83rd Avenue?

10:06:04 11       A.   Yes.

10:06:10 12       Q.   Do you have any tattoos representing Dog Town?

10:06:14 13       A.   Yes, I do.

10:06:14 14       Q.   Can you tell me about them?

10:06:18 15       A.   What do you want to know about them?

10:06:19 16       Q.   Well, which ones do you have?

10:06:20 17       A.   I got this one on my arm.

10:06:22 18       Q.   And what is that?

10:06:22 19       A.   It's a D and a T, and it says Dog Town.

10:06:26 20       Q.   When did you get that?

10:06:27 21       A.   When I was like 14, 15.

10:06:30 22       Q.   Okay.  Any others?

10:06:32 23       A.   I got an 8 and a 3 on my hands.

10:06:37 24       Q.   And that stands for 83rd Avenue?

10:06:39 25       A.   Yes.

| | | |
|---|---|---|
| 10:06:39 | 1 | Q.   When did you get that one? |
| 10:06:42 | 2 | A.   When I was like 16, 17. |
| 10:06:44 | 3 | Q.   Okay.   What else? |
| 10:06:46 | 4 | A.   And then -- and then I got West Side on my hands. |
| 10:06:52 | 5 | Q.   Okay.   When did you get that one? |
| 10:06:55 | 6 | A.   When I was like 16, 17. |
| 10:06:57 | 7 | Q.   And what else? |
| 10:06:58 | 8 | A.   That's about it.   I got a West Side on my legs |
| 10:07:03 | 9 | too. |
| | 10 | Q.   Okay. |
| 10:07:03 | 11 | A.   I got them all around the same time when I was |
| 10:07:06 | 12 | 16, 17.   Only other tattoo I got, I got Peoria on my chest |
| 10:07:10 | 13 | and on my neck.   It's where I came from.   So it's where I |
| 10:07:14 | 14 | grew up at. |
| 10:07:16 | 15 | Q.   Okay. |
| | 16 | A.   I got that in prison. |
| 10:07:18 | 17 | Q.   And I see that you have a tattoo along the right |
| 10:07:21 | 18 | side of your face? |
| 10:07:22 | 19 | A.   Yes. |
| 10:07:22 | 20 | Q.   Are those dog paw prints? |
| 10:07:25 | 21 | A.   Yes. |
| 10:07:25 | 22 | Q.   Is that tattoo related to Dog Town? |
| 10:07:28 | 23 | A.   Yeah. |
| 10:07:28 | 24 | Q.   When did you get that tattoo? |
| 10:07:30 | 25 | A.   I got that in 2017 when I was in county. |

10:07:36 1    Q.    So your testimony, I thought, was that you

10:07:42 2    stopped being a member of Dog Town --

10:07:45 3    A.    Yeah.

10:07:45 4    Q.    -- in 2016?

5    A.    Yeah.

10:07:45 6    Q.    Yet you still got a tattoo representing the gang

10:07:48 7    in 2017?

10:07:48 8    A.    Yeah.  It's just -- that's -- that was what I

10:07:51 9    grew up to.  You know what I'm saying?  I always wanted a

10:07:54 10   tattoo like that, so I got it.  But I'm not a part of --

10:07:58 11   as to running around with a gang and going and committing

10:08:02 12   crimes, that's not me no more.  That's not what I'm about

10:08:06 13   anymore.

10:08:06 14         But me stop associating with them, that's for me

10:08:09 15   to say that I'm not running with them no more and I'm not

10:08:12 16   doing it.  But if someone asks me, Where did you grow up

10:08:17 17   at?  Where do you come from?  Where were you a part of?  I

10:08:19 18   mean, I'm going to say I came from a group in Dog Town.

10:08:22 19   I'm from Peoria.  I mean, that's what I know since I was a

10:08:25 20   little kid.  You get what I'm saying?

10:08:28 21   Q.    Help me understand if you're trying to separate

10:08:31 22   yourself from that type of lifestyle --

10:08:33 23   A.    Yeah, that was --

24   Q.    -- why you --

10:08:35 25   A.    -- a bad tattoo to get.

10:08:37  1                    MR. RUNDALL:  Let her finish her question.

10:08:38  2                    THE WITNESS:  Oh.

10:08:38  3     BY MS. ELLIOTT:

10:08:39  4          Q.   I appreciate that.

        5          A.   Yeah.

10:08:40  6          Q.   Let me just say my question again.

10:08:42  7          A.   Okay.

10:08:42  8          Q.   I just want you to help me understand if you're

10:08:45  9     trying to separate yourself from that lifestyle and if

10:08:46 10     you're telling us today under oath that you haven't been a

10:08:49 11     member since 2016 --

10:08:51 12          A.   Yeah.

10:08:51 13          Q.   -- why you would get another tattoo representing

10:08:56 14     that organization?

10:08:57 15          A.   It was a bad tattoo to get, but I did it.

10:09:00 16          Q.   Do you also have the same sort of paw print

10:09:10 17     tattoo on your chest?

10:09:11 18          A.   Yes.

10:09:12 19          Q.   Did you get that at the same time?

10:09:13 20          A.   No.

10:09:13 21          Q.   When did you get that one?

10:09:14 22          A.   The one on my chest?

10:09:16 23          Q.   Yeah.

10:09:16 24          A.   When I came down my first time, 2013.

10:09:20 25          Q.   I'm sorry.  2013?

11:18:01  1    time?

11:18:01  2        A.   No.  We didn't really have an exact address.

11:18:09  3        Q.   What do you mean you didn't have an exact

11:18:12  4    address?

11:18:12  5        A.   We didn't have a house.  We were just on the

11:18:14  6    move.

11:18:15  7        Q.   You and Ashley?

11:18:16  8        A.   Yeah.  Yeah.

11:18:16  9        Q.   Were you living out of her car?

11:18:18 10        A.   Yes, you could say that.

11:18:20 11        Q.   So this incident on March 3rd, 2017, occurred in

11:18:24 12    front of Ashley's family's house; correct?

11:18:27 13        A.   Yeah.

11:18:28 14        Q.   And you were there on March 3rd; correct?

11:18:30 15        A.   Uh-huh.

11:18:30 16        Q.   Was that a yes?

11:18:31 17        A.   Yes.

11:18:32 18        Q.   Okay.  Why were you at Ashley's family's house on

11:18:36 19    March 3rd, 2017?

11:18:37 20        A.   To visit.

11:18:38 21        Q.   To visit her family?

11:18:40 22        A.   Uh-huh.

11:18:41 23        Q.   And did you drive there?

11:18:42 24        A.   Yes.

11:18:42 25        Q.   In Ashley's car?

11:18:44  1      A.    Uh-huh.

11:18:45  2      Q.    Who drove?

11:18:46  3      A.    I did.

11:18:47  4      Q.    Who else was in the car?

11:18:49  5      A.    Me and Ashley.

11:18:53  6      Q.    Just you and Ashley?

11:18:54  7      A.    Yeah.

11:18:54  8      Q.    No one else was in the car?

11:18:56  9      A.    No.

11:18:56 10      Q.    And were you carrying a weapon that day?

11:19:05 11      A.    No.

11:19:05 12      Q.    Was there a weapon in the car?

11:19:07 13      A.    Yeah.

11:19:07 14      Q.    What kind of weapon?

11:19:13 15      A.    Gun.

11:19:14 16      Q.    What kind of gun?

11:19:15 17      A.    Nine millimeter.

11:19:17 18      Q.    A nine millimeter?

11:19:19 19      A.    Yeah.

11:19:19 20      Q.    Was it a Jennings nine millimeter?

11:19:22 21      A.    Yeah.

11:19:23 22      Q.    That's semiautomatic?

11:19:25 23      A.    Yeah, you can say that, handgun.

11:19:28 24      Q.    And you were a prohibited possessor at the time;

11:19:34 25  correct?

11:20:16  1    regardless of whether you owned them?

11:20:18  2         A.   No.

11:20:18  3         Q.   What other -- have you owned any other firearms

11:20:25  4    in the past 10 years?

11:20:25  5         A.   No.

11:20:26  6         Q.   Just the nine millimeter?

11:20:28  7         A.   Yes.

11:20:28  8         Q.   And how often did you carry that nine millimeter?

11:20:33  9         A.   Not often.

11:20:34 10         Q.   So not every day?

11:20:37 11         A.   No.

11:20:37 12         Q.   When would you carry it?

11:20:39 13         A.   Mostly I kept it in the car, I mean, pretty much.

11:20:46 14    I never really -- I didn't really like carrying guns.  So

11:20:51 15    I wasn't a big gun guy.

11:20:52 16         Q.   So you -- you said usually you kept it in the

11:20:55 17    car.  Do you mean Ashley's car?

11:20:57 18         A.   Yes.

11:20:57 19         Q.   So was it --

11:20:59 20         A.   And I had a car.  I had a Honda.  Kept it in

         21    there sometimes.

         22              THE COURT REPORTER:  You did what?

11:21:02 23              THE WITNESS:  I had a car, too.

11:21:11 24              THE VIDEOGRAPHER:  One moment.  Could you

11:21:12 25    raise your microphone an inch or two.

BY MS. ELLIOTT:

Q.   Okay.  I apologize.  You said you usually kept it in the car?

A.   Yes.

Q.   Did you usually keep it in Ashley's car?

A.   Yeah, whenever I was with her, yes.

Q.   Okay.  And when you weren't with her, would you put it in your own car?

A.   Or I'd have it -- on that, when I wasn't with her or if I wasn't in my car, I would have it on me.  But if I was in my car, it would be in my car.  Or if I was in her car, it would be in her car.

Q.   Okay.  When you weren't in the car, you said you would have it on you?

A.   Yeah, if I'm in my car.  If I'm taking off with someone else, I'll have it on me.

Q.   Okay.  Where would you keep it on you?

A.   Pocket.

Q.   Front pocket?

A.   Yeah.

Q.   Would you ever put it in your back pocket?

A.   No.

Q.   Would you ever put it in your waistband?

A.   No.  Keep it in my pocket.

Q.   Were you aware of -- or do you know if Ashley

11:22:54 1    when you were present?

11:22:55 2              MR. RUNDALL:  Objection.  Form.

11:22:56 3        A.   No.

11:22:56 4    BY MS. ELLIOTT:

11:22:56 5        Q.   Would it surprise you to know that she testified

11:22:59 6    that you did go with her to sell drugs?

11:23:02 7        A.   Yeah.  Yeah, that's crazy.

11:23:04 8        Q.   Yes, that would surprise you?

11:23:06 9        A.   Yeah.

11:23:06 10       Q.   So going back to you arriving at Ashley's

11:23:18 11   family's house on March 3rd, 2017, what happened when you

11:23:22 12   got there?

11:23:22 13       A.   They started arguing.  Her and her brother

11:23:27 14   started arguing --

11:23:27 15       Q.   What is her brother's name?

11:23:29 16       A.   -- and fighting.  I don't know his real name.  I

11:23:35 17   just know him as BJ.

11:23:36 18       Q.   BJ?

        19       A.   Yeah.

11:23:36 20       Q.   So Ashley and BJ started arguing?

11:23:39 21       A.   Yes.

11:23:39 22       Q.   Did you hear what they were arguing about?

11:23:40 23       A.   He didn't want me there at the house.

11:23:42 24       Q.   He didn't like you?

11:23:43 25       A.   No.

11:23:44  1      Q.   Why not?

11:23:44  2      A.   Because he thought things that Ashley was into

11:23:50  3  was because of me.

11:23:51  4      Q.   Things like drugs?

11:23:52  5      A.   Yeah, like drug wise, yeah.

11:23:53  6      Q.   Where were Ashley and BJ when they started

11:23:58  7  arguing?

11:23:59  8      A.   In the front, the front of -- front of the yard

11:24:01  9  in the --

        10      Q.   Where were you?

11:24:02 11      A.   -- street area.

11:24:02 12      Q.   Sorry.  Where were you when they started arguing?

11:24:05 13      A.   I was sitting in the front seat --

11:24:07 14      Q.   Of the car?

11:24:07 15      A.   -- of the car, yeah.

11:24:07 16      Q.   Okay.  And what happened next?

11:24:09 17      A.   They started -- she tried, she claimed, to get

11:24:14 18  back in the car.  And he got off, and they started

11:24:18 19  arguing, started yelling at each other and started like

        20  fighting.

11:24:21 21           And then I was telling her to get in the car.

11:24:24 22  You know what I mean?  I told her -- was trying to tell

11:24:24 23  her, "We're going to leave."

11:24:26 24           And they were -- you know, they started arguing

11:24:29 25  and fighting right there in the front yard.  And then I

11:24:33 1  pulled the gun out, and I shot twice in the air so they

11:24:37 2  could stop.  And then she jumped in the car, and we took

11:24:39 3  off.

11:24:39 4      Q.   So when you fired the gun, you were still sitting

11:24:42 5  in the front driver's side seat?

11:24:44 6      A.   Yes.

11:24:44 7      Q.   Who else was present during this argument?

11:24:49 8      A.   Outside, it was just us and BJ and the dad.

11:24:55 9      Q.   Why did you -- why did you fire the gun?

11:25:13 10     A.   To get them to stop arguing to get Ashley in the

11:25:17 11  car.

11:25:18 12     Q.   Did you intend to shoot someone?

11:25:20 13     A.   No.

11:25:20 14     Q.   What did you intend to do?

11:25:23 15          MR. RUNDALL:  Objection.  Form.

11:25:27 16     A.   Just get everybody to stop so we could take off.

11:25:33 17  BY MS. ELLIOTT:

11:25:33 18     Q.   Are you aware that witnesses stated that you

11:25:37 19  actually fired at BJ?

11:25:39 20     A.   Yeah, that's a lie.

11:25:40 21     Q.   Was there a child in the vicinity when you fired

11:25:43 22  the weapon?

11:25:43 23     A.   He said he had his son there, but he wasn't -- he

11:25:47 24  wasn't there.

11:25:47 25     Q.   So you're saying that was a lie when he said his

11:25:51  1    son was there?

11:25:52  2         A.    Yeah.

11:25:53  3         Q.    And how many shots did you fire?

11:25:55  4         A.    I shot two in the air.

11:25:59  5         Q.    Did you fire it at all after that?

11:26:01  6         A.    Yeah, when I -- when I left because he -- he

11:26:07  7    threw a rock through my window.  Then I fired two more

11:26:09  8    after I took off from the house.  And that was it.

11:26:11  9         Q.    So where were you when you fired those two shots?

11:26:14 10         A.    Down the street.

11:26:15 11         Q.    And in what direction did you fire them?

11:26:17 12         A.    In the air.

11:26:18 13         Q.    Straight up?

11:26:19 14         A.    Uh-huh.

11:26:19 15         Q.    So you fired four shots total?

11:26:21 16         A.    Yes.

11:26:22 17         Q.    Two at the house and then you drove --

11:26:24 18         A.    No.  I never said "at the house."  I said "in the

11:26:28 19    air."

11:26:28 20         Q.    Absolutely right.  That's what I meant.  So the

11:26:30 21    car was still parked in front of the house?

11:26:32 22         A.    Yes.

11:26:32 23         Q.    You fired two shots into the air?

11:26:35 24         A.    Yes.

11:26:35 25         Q.    Then you drove down the street and you fired two

11:26:37 1   more shots in the air?

11:26:38 2       A.   Yes.

11:26:39 3       Q.   Did you fire any other shots?

11:26:40 4       A.   No.

11:26:40 5       Q.   Were you under the influence of alcohol at the

11:26:43 6   time --

11:26:43 7       A.   No.

11:26:43 8       Q.   -- of this incident?

11:26:45 9       A.   No.

11:26:45 10      Q.   Were you under the influence of any drugs at the

11:26:50 11  time of this March 3rd, 2017, incident?

11:26:53 12      A.   Yes.  I was on meth.

11:26:55 13      Q.   Were you also on heroin?

11:26:59 14      A.   No.

11:26:59 15      Q.   Do you think the meth affected your decision to

11:27:06 16  fire the weapon?

11:27:07 17              MR. RUNDALL:  Objection.  Form.

11:27:08 18      A.   Yeah.  It kind of clouded my bad poor judgment.

11:27:13 19  BY MS. ELLIOTT:

11:27:13 20      Q.   So after you fired the second two shots, what

11:27:18 21  happened?

11:27:18 22      A.   Then we took off.

11:27:19 23      Q.   Where did you go?

11:27:23 24      A.   Just left the house.

11:27:24 25      Q.   Where did you go?

11:27:28  1       A.    To a friend's house.

11:27:29  2       Q.    What friend is that?

11:27:30  3       A.    A friend that I used to always hang out with.  He

11:27:35  4   used to let me stay there whenever I needed to go over

11:27:36  5   there.

11:27:37  6       Q.    What is his name?

11:27:38  7       A.    Mike, Mikey.  I call him Mikey.  That's all I

11:27:41  8   know him as.

11:27:42  9       Q.    You don't know his last name?

11:27:44 10       A.    No.

11:27:44 11       Q.    BJ had reported to the police that he believed

11:27:50 12   you were wanted for a hit and run on a police officer and

11:27:55 13   that you were connected to two homicides.  Were you in

11:27:57 14   fact wanted for a hit and run on a police officer?

11:28:01 15             MR. RUNDALL:  Objection.  Form.

11:28:02 16       A.    No.

11:28:02 17             MR. RUNDALL:  And --

11:28:03 18   BY MS. ELLIOTT:

11:28:03 19       Q.    Were you connected to two homicides?

11:28:05 20             MR. RUNDALL:  Objection.  Form.  I'm going to

11:28:07 21   instruct him not to answer based on his Fifth Amendment

11:28:11 22   rights.

11:28:11 23   BY MS. ELLIOTT:

11:28:11 24       Q.    Are you going to follow your attorney's advice

11:28:14 25   and invoke your Fifth Amendment rights?

11:28:17  1      A.    Yes.

11:28:17  2      Q.    BJ also reported to police that you and Ashley

11:28:23  3   left needles at her house before; is that true?

11:28:26  4      A.    No.

11:28:27  5      Q.    Was there ever a time when you felt Ashley blamed

11:28:35  6   you for getting her addicted to drugs?

11:28:37  7            MR. RUNDALL:  Objection.  Form.

11:28:39  8      A.    No, because she was doing drugs when I met her.

11:28:44  9   BY MS. ELLIOTT:

11:28:44 10      Q.    Were you aware in March 2017 that when Ashley

11:28:53 11   spoke with officers, she told them that you weren't even

11:28:57 12   at the house?

11:28:58 13            MR. RUNDALL:  Objection.  Foundation.

11:28:59 14      A.    Yes.

11:28:59 15   BY MS. ELLIOTT:

11:28:59 16      Q.    You were aware of that?

11:29:01 17      A.    Uh-huh.

11:29:01 18      Q.    And were you aware in March 2017 that Ashley told

11:29:06 19   officers someone named Eric actually fired the gun?

11:29:10 20      A.    Yes.

11:29:10 21      Q.    Eric wasn't there that day; right?

11:29:14 22      A.    No.

11:29:15 23      Q.    What is Eric's last name?

11:29:17 24      A.    I don't know.

11:29:18 25      Q.    Are you aware that a witness reported to the

11:29:22  1    police that Eric was actually your best friend?

11:29:24  2        A.    I don't know.

11:29:25  3        Q.    But you're testifying that you don't even know

11:29:29  4    his last name?

11:29:29  5        A.    No.

11:29:30  6        Q.    Was Eric actually a real person?

11:29:32  7        A.    I don't know.

11:29:33  8        Q.    Did you tell Ashley to lie to officers?

11:29:36  9        A.    No.

11:29:36 10        Q.    Do you have any idea why she did?

11:29:39 11        A.    She loves me.

11:29:41 12        Q.    She was trying to protect you?

11:29:43 13        A.    Yeah.

11:29:43 14        Q.    And do you know who Stormy Kunz is?

11:29:47 15        A.    Her brother.

11:29:48 16        Q.    And are you aware that Stormy reported to police

11:29:53 17    that -- it was Stormy that reported to police that Eric

11:29:57 18    was your best friend?

11:29:59 19        A.    Yeah.  I don't know.

11:30:00 20        Q.    Are you aware that Stormy, Stormy Kunz, reported

11:30:05 21    to police that you had assaulted Ashley in the past?

11:30:08 22        A.    Yeah.  I read my police report.

11:30:11 23        Q.    But your testimony is that that's false?

11:30:14 24        A.    Yeah.

11:30:15 25        Q.    Are you aware that Stormy Kunz actually reported

11:30:18  1    to police that Ashley told him that you had beat her?

11:30:22  2        A.    Yeah.   I don't know why she would say that.

11:30:25  3        Q.    But it's your testimony that that is also false?

11:30:32  4        A.    Yeah.

11:30:34  5        Q.    And are you aware that Stormy Kunz told police

11:30:38  6    that in fact your issues with her brother BJ stemmed from

11:30:43  7    the fact that you had assaulted her?

11:30:44  8        A.    It stemmed from the fact that he blamed me for

11:30:47  9    her losing her kids to CPS.

11:30:50 10        Q.    You had testified though that she was doing drugs

11:30:57 11    when you met her; right?

11:30:58 12        A.    Yeah.

11:30:58 13        Q.    So how could it have been your fault?

11:31:01 14        A.    Exactly.

11:31:02 15              MR. RUNDALL:   Objection.   Form and

11:31:04 16    foundation.

11:31:04 17    BY MS. ELLIOTT:

11:31:05 18        Q.    Are you aware that Stormy Kunz reported to the

11:31:07 19    police that you had threatened that you would kill

11:31:09 20    Ashley's whole family?

11:31:11 21        A.    Yeah.   I read my police report.

11:31:11 22              MR. RUNDALL:   Objection.   Form.

         23    BY MS. ELLIOTT:

11:31:15 24        Q.    I'm sorry.   Give him one second to make his

         25    objection.

1          A.    All right.

2          Q.    Can you tell me what your answer was again.  I

11:31:17  3   didn't catch it.

11:31:17  4          A.    I read my police report, yeah.

11:31:19  5          Q.    Is it true that you made that threat to kill

11:31:23  6   Ashley's family?

11:31:24  7          A.    No.

11:31:25  8          Q.    And are you aware that Stormy Kunz reported to

11:31:27  9   the police that you had threatened to shoot BJ in the

11:31:30 10   past?

11:31:30 11          A.    No.

11:31:31 12          Q.    No, you're not aware that he reported that?  Or,

11:31:33 13   no, you didn't do it?

11:31:33 14          A.    No.  I read my police report.  It's not true.

11:31:35 15          Q.    Did you ever call Stormy Kunz after the March 3rd

11:31:45 16   incident and try to convince him to tell the cops that it

11:31:49 17   wasn't you?

11:31:49 18          A.    No.

11:31:49 19          Q.    Do you know why he would report that to the

11:31:53 20   police?

11:31:53 21          A.    No, I don't.  I mean, none of her family like me

11:31:58 22   so...

11:31:58 23          Q.    Are you aware that Stormy Kunz is now

11:32:00 24   incarcerated?

11:32:02 25          A.    Yes.

11:32:03  1      Q.   Do you know whether he's also housed here in this

11:32:07  2   complex?

11:32:07  3      A.   I don't know.

11:32:08  4      Q.   So you haven't seen him --

11:32:09  5      A.   (Witness shakes head.)

11:32:10  6      Q.   -- here?

11:32:11  7      A.   No.

11:32:11  8      Q.   What were you charged with in relation to the

11:32:22  9   March 3rd, 2017, incident?

11:32:23 10      A.   Prohibited possessor, aggravated assault,

11:32:28 11   drive-by shooting, child endangerment, and misconduct

11:32:36 12   involving weapons.

11:32:36 13      Q.   Did you plead guilty to any of those counts?

11:32:39 14      A.   The only thing I pled guilty was to aggravated

11:32:43 15   assault.

11:32:43 16      Q.   The other counts were dismissed; right?

11:32:47 17      A.   Yes.

11:32:47 18      Q.   And the aggravated assault was a felony; correct?

11:32:50 19      A.   Yes.

11:32:51 20      Q.   Between March 3rd, 2017, and March 10th, 2017,

11:32:57 21   when you were arrested, were you concerned that you were

11:33:00 22   going to be arrested for what had happened at Ashley's

11:33:04 23   family's house?

11:33:05 24      A.   Yeah.

11:33:05 25      Q.   What actions did you take to avoid being

11:33:08  1    arrested?

11:33:08  2         A.   Stay away from mom's house.

11:33:13  3         Q.   From your own mom's house?

11:33:17  4         A.   Yeah.

11:33:17  5         Q.   Because you thought they would be looking for you

11:33:19  6    there?

11:33:19  7         A.   Yeah.

11:33:20  8         Q.   Did you take any other actions to avoid arrest?

11:33:23  9         A.   No.

11:33:24 10         Q.   So exactly a week later on March 10th, 2017, were

11:33:32 11    you at the Arrowhead Town Center?

11:33:36 12         A.   No.

11:33:38 13         Q.   You were not at Arrowhead Town Center on March

11:33:44 14    10th, 2017, at all?

11:33:46 15              MR. RUNDALL:   Objection to form.

11:33:47 16         A.   I can't -- I can't remember.

11:33:48 17    BY MS. ELLIOTT:

11:33:48 18         Q.   I'm specifically referring to an event, an

11:33:53 19    incident at the J.C. Penney at Arrowhead Town Center.

11:33:59 20         A.   What incident?

11:34:00 21         Q.   Well, first of all, were you there on --

         22         A.   No.

11:34:03 23         Q.   -- March 10, 2017?

11:34:04 24         A.   Huh-uh.

11:34:05 25         Q.   So you were not --

11:34:05 1    A.    No.

11:34:06 2    Q.    -- at the Arrowhead Town Center at all on March

11:34:08 3  10th, 2017?

11:34:09 4    A.    No, not that I remember.

11:34:12 5    Q.    Okay.  Are you -- would it surprise you to know

11:34:18 6  that Ashley testified you were at J.C. Penney with her --

7    A.    No, it wouldn't surprise me.

11:34:24 8    Q.    -- on March 10th, 2017?

11:34:27 9    A.    All right.

11:34:27 10    Q.    I mean, is that surprising?

11    A.    Yeah.

11:34:27 12    Q.    Because you're testifying that you weren't?

11:34:30 13    A.    I don't remember that day.  That's what I'm

11:34:31 14  saying.

11:34:31 15    Q.    Do you remember an incident occurring at a J.C.

16  Penney?

11:34:33 17    A.    I remember my police report, them saying I was

11:34:36 18  there, yeah.

11:34:36 19    Q.    Okay.  So you remember that being reported --

11:34:38 20    A.    Yes.

11:34:39 21    Q.    -- in the police report?

11:34:40 22    A.    Yes.

11:34:40 23    Q.    But you don't remember any such incident?

11:34:44 24    A.    Yeah.

11:34:44 25    Q.    Yes, that's correct; you don't remember?

11:34:47 1    A.    Yeah.

11:34:47 2    Q.    So you don't recall whether you were at J.C.

11:34:58 3  Penney and approached the checkout line carrying some

11:35:01 4  merchandise?

11:35:03 5    A.    Oh, yeah, I know what you're talking about.

11:35:09 6              MS. ELLIOTT:  Okay.

11:35:10 7              THE WITNESS:  Do I have to answer these

11:35:12 8  questions, this one?

11:35:13 9              MR. RUNDALL:  She's asking you these

11:35:15 10  questions about that time period --

11    THE WITNESS:  Yeah.

11:35:16 12              MR. RUNDALL:  -- that she's talking about in

11:35:17 13  March so...

11:35:18 14              THE WITNESS:  I'm saying I remember what was

11:35:19 15  going on, but that's open stuff that hasn't even --

11:35:25 16              MR. RUNDALL:  It's in terms of --

11:35:34 17              MS. ELLIOTT:  I suspect this might be a Fifth

11:35:39 18  Amendment issue.

11:35:39 19              MR. EWING:  Do you want to invoke your Fifth

20  Amendment rights?

11:35:41 21              THE WITNESS:  Yes, I do.

11:35:42 22              MR. RUNDALL:  Okay.  Then I'll instruct you

23  not to answer based on your Fifth Amendment rights.

24              THE WITNESS:  Thank you.

11:35:44 25              MS. ELLIOTT:  Okay.  Sorry about that.

11:35:44  1   BY MS. ELLIOTT:

11:35:44  2       Q.   I understand.  I'm going to go through my

11:35:46  3   questions, and you can --

        4       A.   Yeah, yeah, yeah.

11:35:47  5       Q.   -- invoke your Fifth Amendment rights as to each

11:35:51  6   question.  Does that make sense?

11:35:51  7       A.   Yes.

11:35:53  8            MS. ELLIOTT:  Okay.  So I'm going to start

11:35:54  9   over because we were --

11:35:54 10            MR. RUNDALL:  That sounds good.  Thank you.

11:35:55 11            MS. ELLIOTT:  -- getting a little confused.

11:35:55 12   BY MS. ELLIOTT:

11:35:57 13       Q.   Sir, I'm referring to an incident on March 10th,

11:35:59 14   2017.  Were you at Arrowhead Town Center on that day?

11:36:03 15            MR. RUNDALL:  I' going to object and instruct

11:36:05 16   him not to answer based on his Fifth Amendment rights.

11:36:08 17   BY MS. ELLIOTT:

11:36:08 18       Q.   And after every question, if it's okay with your

11:36:09 19   attorney, you can just say, "I invoke my Fifth Amendment

11:36:11 20   rights not to answer."

11:36:12 21            MR. RUNDALL:  That's okay.

11:36:13 22            THE WITNESS:  All right.

11:36:14 23   BY MS. ELLIOTT:

11:36:14 24       Q.   Were you at the J.C. Penney at Arrowhead Town

11:36:20 25   Center on March 10th, 2017?

11:36:20  1          A.    I invoke my Fifth Amendment.

11:36:22  2          Q.    Do you recall an incident where you approached

11:36:25  3    the checkout line at J.C. Penney carrying merchandise?

11:36:27  4          A.    I invoke my Fifth Amendment.

11:36:29  5          Q.    Did you then start walking towards the door

11:36:31  6    without paying for the merchandise?

11:36:32  7          A.    I invoke my Fifth Amendment.

11:36:34  8          Q.    And did you then exit the first set of doors to

11:36:37  9    the exterior of the store carrying the merchandise you had

11:36:40 10    not paid for?

11:36:41 11          A.    I invoke my Fifth Amendment.

11:36:43 12          Q.    Were you then approached by two store employees?

11:36:45 13          A.    I invoke my Fifth Amendment.

11:36:48 14          Q.    Did those employees then identify themselves as

11:36:50 15    loss prevention officers?

11:36:53 16          A.    I invoke my Fifth Amendment.

11:36:54 17          Q.    And did you attempt to run out the doors?

11:36:56 18          A.    I invoke my Fifth Amendment.

11:36:58 19          Q.    And did the employees attempt to stop you?

11:37:01 20          A.    I invoke my Fifth Amendment.

11:37:03 21          Q.    And did they then knock merchandise -- the

11:37:05 22    merchandise out of your hands?

11:37:06 23          A.    I invoke my Fifth Amendment.

11:37:09 24          Q.    And then did you in fact punch the male employee

11:37:11 25    in the upper right temple area near his eye?

11:37:14  1          A.    I invoke my Fifth Amendment.

11:37:16  2          Q.    And did you then get into Ashley's vehicle?

11:37:19  3          A.    I invoke my Fifth Amendment.

11:37:20  4          Q.    Were there other people -- were there any other

11:37:23  5    people in the vehicle with Ashley?

11:37:24  6          A.    I invoke my Fifth Amendment.

11:37:27  7          Q.    And did you have your nine millimeter with you on

11:37:30  8    March 10th?

11:37:31  9          A.    I invoke my Fifth Amendment.

11:37:33 10          Q.    Did you have any other weapons with you on that

11:37:35 11    day?

11:37:36 12          A.    I invoke my Fifth Amendment.

11:37:38 13          Q.    Was there a gun in Ashley's car when she picked

11:37:41 14    you up at the J.C. Penney?

11:37:44 15          A.    I invoke my Fifth Amendment.

11:37:46 16          Q.    Okay.  I'm going to move on.

11:37:48 17          A.    Thank you.

11:37:48 18          Q.    At some point on March 10th, you did meet up with

11:37:52 19    Ashley; correct?

11:37:52 20          A.    Yes.

11:37:53 21          Q.    And when was that?

11:37:53 22          A.    In the nighttime.

11:37:57 23          Q.    Do you know approximately what time?

11:37:59 24          A.    No, I don't.

11:38:01 25          Q.    Where did you meet her?

11:40:09  1   that night?

11:40:09  2        A.   Just hanging out.

11:40:10  3        Q.   For your birthday?

11:40:12  4        A.   Yeah.

11:40:12  5        Q.   What time did you arrive?

11:40:13  6        A.   Midnight, 11:00 o'clock, 10:00 o'clock, something

11:40:21  7   like that.

11:40:21  8        Q.   So kind of later?

11:40:22  9        A.   Yeah.

11:40:23 10        Q.   Who else was at Jordan's house when you arrived?

11:40:29 11        A.   We got there, and his grandma was there, his mom,

11:40:35 12   his mom's boyfriend, and one of his uncles.

11:40:41 13        Q.   So I'm sorry.  His grandmother, his mom, his

11:40:49 14   mom's boyfriend, and his uncle?

11:40:51 15        A.   One of his uncles, yeah.

11:40:53 16        Q.   And then you showed up, and it was you and Ashley

11:40:57 17   and your friend Mike?

11:40:58 18        A.   Yeah.

11:40:59 19        Q.   Was there anyone else at the house that you can

11:41:01 20   remember?

11:41:01 21        A.   No.

11:41:01 22        Q.   And did you have a gun with you when you arrived?

11:41:07 23        A.   No.

11:41:07 24        Q.   Where was your gun at that time?

11:41:09 25        A.   I had got rid of it already.

11:41:56   1          MR. RUNDALL:  Objection.  Form.

11:41:57   2   BY MS. ELLIOTT:

11:41:58   3      Q.   I'm just wondering when you got rid of it.

11:41:59   4      A.   In March.

11:42:00   5      Q.   So right before the incident?

11:42:02   6      A.   With my leg, that incident?

11:42:04   7      Q.   Uh-huh, the arrest.

11:42:07   8      A.   You could say that, yeah, before that happened.

11:42:09   9      Q.   Within days?

11:42:12  10          MR. RUNDALL:  Objection.  Form.  I'm going to

11:42:15  11   instruct him not to answer based on his Fifth Amendment

11:42:18  12   rights.

11:42:18  13   BY MS. ELLIOTT:

11:42:19  14      Q.   So you didn't have any weapon with you when you

11:42:22  15   arrived at Jordan's on March 10th, 2017?

11:42:24  16      A.   No.

11:42:24  17      Q.   Did you have any -- did you bring any drugs with

11:42:29  18   you to Jordan's house?

11:42:30  19      A.   No.

11:42:30  20      Q.   Did you bring any alcohol with you to Jordan's

11:42:34  21   house?

11:42:34  22      A.   No.

11:42:34  23      Q.   Had you taken any drugs on March 10th, prior to

11:42:39  24   arriving at Jordan's house?

11:42:40  25      A.   Yeah.  I did some meth earlier that day.

11:42:44  1    Q.    Okay.  Around what time had you done meth?

11:42:46  2    A.    Afternoon time.

11:42:49  3    Q.    Do you know how much you did?

11:42:50  4    A.    No.

11:42:51  5    Q.    Had you done heroin on March 10th?

11:42:57  6    A.    No.

11:42:58  7    Q.    Did you do any meth at Jordan's house?

11:43:05  8    A.    Yeah, we did.  I did.

11:43:06  9    Q.    You did?

11:43:07 10    A.    Uh-huh.

11:43:07 11    Q.    Do you know how much?

11:43:08 12    A.    No.

11:43:09 13    Q.    Did you do heroin at Jordan's house?

11:43:13 14    A.    Yeah.

11:43:14 15    Q.    And I'm talking about March 10th, 2017, when you

11:43:16 16  were there; correct?

11:43:17 17    A.    Yes.

11:43:17 18    Q.    Okay.  So you had done both meth and heroin at

11:43:21 19  Jordan's?

11:43:22 20    A.    Yeah.

11:43:22 21    Q.    Prior to getting arrested?

11:43:24 22    A.    Yeah.

11:43:25 23    Q.    Okay.  I want to kind of just -- I want you to

11:43:28 24  have -- I want to have you tell me how this incident kind

11:43:31 25  of all played out from the beginning to end; does that

11:43:34  1    make sense?

11:43:34  2         A.    Yeah.

11:43:35  3         Q.    So once you arrived at Jordan's, what's the first

11:43:37  4    thing that you did when you arrived?

11:43:39  5         A.    Just went and started hanging out in his room.

11:43:41  6         Q.    In his room?

11:43:42  7         A.    Yeah.  I took a shower, started getting ready.

11:43:45  8    Got ready right there.

11:43:47  9         Q.    Got ready to go where?

11:43:48 10         A.    To go out for my birthday.

11:43:51 11         Q.    Okay.  And then did you start drinking at some

11:43:55 12    point?

11:43:55 13         A.    No, we didn't drink -- I didn't drink at all that

11:44:00 14    day.

11:44:00 15         Q.    And how long had you been at Jordan's house

11:44:06 16    before you did meth?

11:44:07 17         A.    As soon as I got there, we started getting high.

11:44:16 18         Q.    And do you smoke meth?

11:44:17 19         A.    I shoot it up.

11:44:20 20         Q.    Okay.  So you were shooting it up that night?

11:44:22 21         A.    Yeah.

11:44:22 22         Q.    And how about heroin, how do you ingest heroin?

11:44:26 23         A.    I smoke it.

11:44:27 24         Q.    Okay.  Do you ever shoot up heroin?

11:44:29 25         A.    No.

11:44:29  1      Q.   So is it fair to say then that on March 10th when
11:44:33  2   you were at Jordan's, you shot up meth and you smoked
11:44:36  3   heroin?
11:44:37  4      A.   Yes.
11:44:37  5      Q.   And approximately how long were you at Jordan's
11:44:41  6   house before you smoked heroin?
11:44:42  7      A.   Probably an hour.
11:44:43  8      Q.   So you did meth right away?
11:44:47  9      A.   Yeah.
11:44:48 10      Q.   And about an hour later, you did heroin?
11:44:51 11      A.   Yeah.
11:44:51 12      Q.   And can you estimate how much heroin you did?
11:44:55 13      A.   No.
11:44:58 14      Q.   And you can't estimate how much meth you did
11:45:01 15   either?
11:45:01 16      A.   No.
11:45:02 17      Q.   Did you see Ashley do meth also?
11:45:09 18      A.   Yeah.  We were -- me and her were getting high
11:45:13 19   together.
11:45:14 20      Q.   She didn't do the heroin though?
11:45:15 21      A.   No.
11:45:16 22      Q.   Did she also shoot up meth?
11:45:18 23      A.   Yes.
11:45:18 24      Q.   How long were you at Jordan's house before the
11:45:31 25   police arrived?

11:46:42  1      Q.   Getting ready to go out?

11:46:44  2      A.   Yeah.

11:46:44  3      Q.   And what happened next?

11:46:46  4      A.   Getting ready to go out.  We went outside, smoked

11:46:50  5  a cigarette.  And then me and Jordan came back inside.

11:46:54  6  And I was finishing up getting ready.  And that's when the

11:46:58  7  cops -- that's when the cops hit the house, and they threw

11:47:01  8  flash grenades.  And I went and ran to the front door and

11:47:06  9  looked outside.  So I seen them all running up, and then I

11:47:08  10  run out the back door.

11:47:09  11      Q.   Let me slow you down a little bit and just take

11:47:11  12  it piece by piece.

11:47:13  13          When officers arrived at the house, where were

11:47:18  14  you exactly?  Were you in the front room?

11:47:21  15      A.   In Jordan's room.

11:47:22  16      Q.   In his bedroom?

11:47:23  17      A.   Uh-huh.

11:47:24  18      Q.   Do you know if anyone at Jordan's house that

11:47:26  19  night had a weapon?

11:47:27  20      A.   No.

11:47:27  21      Q.   No, you don't know?

11:47:28  22      A.   I don't know.

11:47:29  23      Q.   So how did you know when the cops arrived?

11:47:37  24      A.   I heard the flash grenades.

11:47:40  25      Q.   And did they throw the flash grenades in the

11:47:44  1  front door?

11:47:44  2       A.    Yeah, in the front yard.

11:47:45  3       Q.    In the front yard?

11:47:46  4       A.    Yeah.

11:47:47  5       Q.    Okay.  And so then you said that you went and

11:47:49  6  looked out the front window?

11:47:51  7       A.    Yeah.

11:47:51  8       Q.    And how many cops did you see?

11:47:54  9       A.    A lot, a SWAT team.

11:47:56 10       Q.    Can you estimate how many there were?

11:47:58 11       A.    Six, seven, eight, nine cops.

11:48:01 12       Q.    So you saw the SWAT team?

11:48:05 13       A.    Yes.

11:48:06 14       Q.    Did you see any officers that looked like they

11:48:10 15  were from another agency?

11:48:12 16       A.    I didn't really see like that.

11:48:15 17       Q.    Had you ever seen or heard a flash grenade

11:48:20 18  before?

11:48:20 19       A.    No.

11:48:21 20       Q.    You said you looked out the window and you saw

11:48:31 21  somewhere between six to nine cops and a SWAT team.  What

11:48:34 22  happened next?

11:48:34 23       A.    I ran out the back door.

11:48:36 24       Q.    Okay.  Why did you run?

11:48:37 25       A.    Because I was on the run.

11:48:39  1          Q.    Because you had violated your --

11:48:41  2          A.    Parole.

11:48:42  3          Q.    -- parole?  Did you hear the cops say anything

11:48:47  4    before you ran out the back door?

11:48:48  5          A.    No.

11:48:48  6          Q.    You didn't even hear the, you know, "State

11:48:53  7    police.  Open up," or anything like that?

11:48:55  8          A.    No.

11:48:56  9          Q.    When you ran out the back door, which way did you

11:49:00 10    go?

11:49:01 11          A.    Left.

11:49:02 12          Q.    And did you hop a fence?

11:49:06 13          A.    Yes.

11:49:06 14          Q.    So then once you hopped the fence, you were in

11:49:09 15    the neighbor's backyard; correct?

11:49:11 16          A.    Yeah.

11:49:12 17          Q.    And where did you go from there?

11:49:14 18          A.    I hopped a couple fences.  And then there was

11:49:20 19    more cops.  I could tell there was more cops up ahead.  So

11:49:22 20    then I came back.  And then I hid inside a shed, and I was

11:49:26 21    there for a little bit.

11:49:27 22          Q.    How many yards do you think you were in?

11:49:30 23          A.    Two houses.

11:49:31 24          Q.    So you think you went to the next house and then

11:49:33 25    one more house?

11:49:34 1      A.   Yeah.

11:49:35 2      Q.   And then you saw more cops up ahead?

11:49:37 3      A.   Yeah.

11:49:38 4      Q.   And so you turned back?

11:49:39 5      A.   Yeah.

11:49:40 6      Q.   And did you hop back into the --

11:49:41 7      A.   Yeah.

11:49:42 8      Q.   Okay.  And you said then you hid in a shed?

11:49:46 9      A.   Yeah.

11:49:46 10     Q.   In the backyard?

11:49:47 11     A.   Yeah.

11:49:48 12     Q.   At that point when you were hiding in that shed,

11:49:51 13 did you hear any officers?

11:49:53 14     A.   Yeah.

11:49:53 15     Q.   What did you hear?

11:49:55 16     A.   I just heard the helicopters and the cops.  I

11:49:58 17 heard the cops walking past me.  And then they walked past

11:50:05 18 me.  Then I got out from the shed, and then I got to the

11:50:08 19 roof.  There was a ladder right there.  I got to the roof.

11:50:12 20     Q.   So was the shed in the backyard of the house that

11:50:17 21 you eventually climbed up on the roof of?

11:50:19 22     A.   Yes.

11:50:19 23     Q.   When you say that you heard the cops walking by,

11:50:23 24 did you mean that you heard them walking around in the

11:50:25 25 backyard near the shed while you were hiding in it?

11:50:27  1       A.    Yes.

11:50:27  2       Q.    Okay.  Did you hear them give any commands?

11:50:30  3       A.    No.  No, I didn't.  I just knew they were there.

11:50:35  4       Q.    Okay.  So you just kind of heard them talking?

11:50:37  5       A.    Yeah.

11:50:37  6       Q.    Did you know they had a K-9 in the backyard?

11:50:40  7       A.    Not in the backyard, no.  There was no K-9 back

11:50:43  8    there.

11:50:43  9       Q.    Okay.  So did you at all, while you were hiding

11:50:46 10    in the shed, hear them give a K-9 command?

11:50:51 11       A.    No.  There was no K-9 right there.

11:50:53 12       Q.    So when did you exit the shed?

11:50:56 13       A.    I just came out.

11:50:58 14       Q.    Let me go back for a second.  How long do you

11:51:01 15    think you hid in the shed for?

11:51:03 16       A.    Ten minutes.  Probably about ten minutes.

11:51:07 17       Q.    Okay.  Why did you decide to leave the shed?

11:51:10 18       A.    I don't know.  Something just told me to get out

11:51:13 19    of there.  And then when I came out, I seen the ladder and

11:51:16 20    got to the roof.

11:51:16 21       Q.    And the ladder went up into the roof?

11:51:19 22       A.    Yes.

11:51:19 23       Q.    Were you at some point in a tree?

11:51:21 24       A.    Yes.

11:51:21 25       Q.    Okay.  Well, let me go back.  After you climbed

11:51:24 1    the ladder, then what did you do?

11:51:26 2        A.   Got to the tree.

11:51:27 3        Q.   Okay.  And then you climbed up into the tree?

11:51:29 4        A.   Yes.

11:51:29 5        Q.   Okay.  And then what did you do from there?

11:51:31 6        A.   I stood right there in the tree.  And then the

11:51:34 7    cop seen me.  He was trying -- then that's when he was

11:51:37 8    telling -- commanding me.  He's like telling me to get off

11:51:40 9    the roof.

11:51:41 10       Q.   Who -- were you spotted by the helicopter when

11:51:43 11   you were in the tree?

11:51:44 12       A.   No.  I think I was spotted by the dude with --

11:51:47 13       Q.   So an officer down below on the ground saw you?

11:51:51 14       A.   Yeah.

11:51:51 15       Q.   And then you said he gave you commands.  What did

11:51:53 16   he say?

11:51:53 17       A.   To come off the roof.

11:51:56 18       Q.   You were in the tree at that point?

11:51:57 19       A.   Yeah.

11:51:57 20       Q.   Right?  Okay.  So what did you do next?

11:51:59 21       A.   So I went to the front of the house.  And then I

11:52:03 22   sat down on the front of the house.  And I told them that

23   I give up.  I said, "All right.  I'll come down.  I

11:52:10 24   surrender."

11:52:10 25       Q.   Hold on.  Let me go back for a minute.  You came

11:52:12  1    down from the tree, and you got on the roof; right?

11:52:13  2         A.   I was on the roof the whole time.  The tree just

11:52:16  3    hung over the roof.

11:52:17  4         Q.   Okay.  You had not climbed in the tree?

11:52:20  5         A.   No.

11:52:20  6         Q.   Okay.  I understand.  Sorry.  So the tree was

11:52:23  7    just kind of hanging over the roof?

11:52:25  8         A.   Yes.

11:52:25  9         Q.   So you were sort of hidden by the tree?

11:52:27 10         A.   Yes.

11:52:28 11         Q.   Okay.  And that was towards the backyard side of

11:52:30 12    the roof; correct?

11:52:31 13         A.   Yes.

11:52:31 14         Q.   Okay.  And so you're -- you then moved to the

11:52:34 15    front of the roof?

11:52:35 16         A.   Yes.

11:52:35 17         Q.   Did you ever at some point go back to the back of

11:52:37 18    the roof?

11:52:38 19         A.   No.

11:52:39 20         Q.   Did you walk around at all on the roof?

11:52:43 21         A.   No.

11:52:44 22         Q.   So you -- they spotted you.  And they said, "Come

11:52:47 23    down off the roof."  And your testimony is that you walked

11:52:50 24    right up to the front of the roof and sat down on the

11:52:53 25    edge?

11:52:53 1     A.   Yeah, pretty much.

11:52:54 2     Q.   Okay.  And what commands had you heard at that

11:53:01 3 point from the officers?

11:53:02 4     A.   They were telling me, "Jump off the roof."  And I

11:53:05 5 was like:  "All right.  I surrender.  I'm going to come

11:53:07 6 off the roof."  Know what I mean?  Just let me jump off.

7 Know what I mean?

11:53:10 8          And then that's when the cop walked -- ran up,

11:53:15 9 and he tased me, and I fell off the roof.

11:53:18 10    Q.   I just want to clarify.  You are now two houses

11:53:27 11 down from Jordan's house; right?  There's Jordan's house

11:53:31 12 and then a house and then the house where you're on the

11:53:33 13 roof; correct?

11:53:34 14    A.   I don't really know how many houses I was down

11:53:37 15 from.

11:53:37 16    Q.   Okay.  There was at least one house in between;

11:53:39 17 right?

11:53:39 18    A.   Okay.  I don't know.  I don't remember.

11:53:40 19    Q.   Because you had hopped through two back yards?

11:53:43 20    A.   Yeah, but I came back.  All I remember is coming

11:53:46 21 back.  And I don't know if I landed in the house next to

11:53:49 22 Jordan's or the house -- the second house.

11:53:52 23    Q.   Okay.  And did you see the helicopter above you?

11:53:57 24    A.   Yeah.

11:53:58 25    Q.   And what was your intent when you got on the

11:54:01 1   roof?

11:54:03 2       A.   Just wanted to catch my breath.

11:54:06 3       Q.   And what were you going to do next?

11:54:08 4       A.   I was going to give up.  I knew I was caught.

11:54:13 5       Q.   So why didn't you just come down off the ladder?

11:54:16 6       A.   I don't know.  Because all the cops were in

11:54:19 7   front, so I just went to where the cops were to give up.

11:54:24 8       Q.   When you were on the roof, could you see what was

11:54:27 9   going on in front of Jordan's house?

11:54:30 10      A.   Oh, yeah.

11:54:31 11      Q.   What did you see going on at Jordan's house?

11:54:34 12      A.   I seen everybody that was there was outside in

11:54:38 13  handcuffs.

11:54:39 14      Q.   Where were they?

11:54:42 15      A.   In the front yard.

11:54:43 16      Q.   So they were all handcuffed and sitting in the

11:54:47 17  front yard?

11:54:48 18      A.   Yeah.

11:54:48 19      Q.   And could you see whether everyone from the house

11:54:52 20  was handcuffed?

11:54:54 21      A.   Whoever was there, yeah, I seen everybody

11:54:57 22  handcuffed.

11:54:57 23      Q.   And were they all just sitting there, or were

11:54:59 24  they doing something else?

11:55:00 25      A.   Sitting there.

11:55:00   1      Q.    Okay.  What were you wearing at the time?

11:55:08   2      A.    I didn't have a -- I didn't have no shirt on, and

11:55:12   3   I had brown pants on, khaki pants.

11:55:16   4      Q.    Were they cargo pants?

11:55:19   5      A.    They were -- they weren't cargo pants, but they

11:55:23   6   were like -- they're joggers.  That's what they're called.

11:55:26   7      Q.    Okay.  And when you got to the front of the roof,

11:55:32   8   approximately how many officers could you see down below?

11:55:35   9      A.    Ten cops.

11:55:37  10      Q.    Were they surrounding the roof?

11:55:40  11      A.    Yeah.

11:55:40  12      Q.    Were there other officers standing in the street?

11:55:42  13      A.    Yes.

11:55:43  14      Q.    How many other officers would you say were

11:55:47  15   standing in the street?

11:55:48  16      A.    Probably another five, six, seven cops.

11:55:52  17      Q.    And could you see how many officers were down at

11:55:57  18   Jordan's house?

11:55:59  19      A.    There was cops everywhere.

11:56:00  20      Q.    So there were also a number of cops down at

11:56:04  21   Jordan's house?

11:56:05  22      A.    Uh-huh.

11:56:06  23      Q.    And could you see K-9s down below when you were

11:56:09  24   sitting on the roof?

11:56:10  25      A.    No.

11:58:59   1      Q.   And so you're saying that you got tased two

11:59:03   2   separate times --

11:59:04   3      A.   Yeah.

11:59:04   4      Q.   -- correct?  And the first time hit you in the

11:59:05   5   upper chest?

11:59:06   6      A.   Yes.

11:59:06   7      Q.   And then the second time hit you in the ribs?

11:59:08   8      A.   Yes.

11:59:09   9      Q.   Did the Taser have any effect on you the first

11:59:14  10   time?

11:59:14  11      A.   Well, they happened at -- they pretty much

11:59:16  12   happened at the same time, like one right after another.

11:59:20  13      Q.   Okay.  And can you tell me what effect it had on

11:59:22  14   you?

11:59:22  15      A.   Well, I fell off the roof.

11:59:25  16      Q.   Can you tell me what it felt like when you got

11:59:29  17   tased?

11:59:29  18      A.   I can't remember.  I just -- I just locked up.

11:59:34  19   And then as I was locking up, that's when I rolled off the

11:59:37  20   roof.

11:59:38  21      Q.   Okay.  So you felt like your muscles locked up?

11:59:41  22      A.   Yeah.

11:59:42  23      Q.   And so it is your testimony that the Taser caused

11:59:57  24   you to fall off the roof?

11:59:58  25      A.   Yeah.  You could say that, yes.

12:00:01  1    Q.    So you didn't voluntarily jump off the roof?

12:00:04  2    A.    No.  I was trying to before I got tased because I

12:00:07  3    didn't want -- I didn't want to break a leg or something.

12:00:09  4    Know what I mean?

12:00:09  5          So all I was trying to ask them to do is let me

12:00:12  6    jump off the roof myself.  I'm coming down.  I don't have

12:00:15  7    no weapons.  I didn't have a shirt on.  That way they

12:00:18  8    could -- there was no reason for them to even tase me.  I

12:00:20  9    didn't have a shirt on.

12:00:21 10    Q.    What relevance does not having a shirt on have?

12:00:23 11    A.    They could see I have no guns.

12:00:25 12          MR. RUNDALL:  Objection.  Form and

12:00:26 13    foundation.

         14    BY MS. ELLIOTT:

12:00:26 15    Q.    I'm sorry.  What was your answer?

12:00:26 16    A.    They could see I didn't have no weapons.

12:00:27 17    Q.    Didn't you testify earlier that when you carried

12:00:32 18    that nine millimeter with you, you put it in your pocket?

12:00:34 19    A.    Yeah, but I was sitting in front of them.  They

12:00:38 20    could see I didn't have nothing on me.  And I even told

12:00:43 21    them, I mean, "I surrender.  I'm coming down."

12:00:44 22    Q.    Well, the officers can't see in your pocket, can

12:00:47 23    they?

12:00:48 24          MR. RUNDALL:  Objection.  Form and

12:00:49 25    foundation.

12:00:50 1      A.   I don't know.  Maybe not.

12:00:52 2   BY MS. ELLIOTT:

12:00:52 3      Q.   Okay.  So --

12:00:59 4      A.   They're trained to see everything.  They should

12:01:02 5   be able to see, I mean, if I have any guns on me.

12:01:03 6      Q.   They should be able to see if you have a gun in

12:01:06 7   your pocket?

12:01:07 8      A.   Yeah.  Well, yeah.

12:01:08 9      Q.   So when you were tased and it caused you to fall

12:01:12 10  off the roof, kind of explain to me how you fell.

12:01:16 11     A.   I just fell off the roof.

12:01:18 12     Q.   Well, you had said init --

12:01:19 13     A.   Rolled off.

12:01:20 14     Q.   Sorry.  Go ahead.

12:01:21 15     A.   Rolled off.

12:01:23 16     Q.   So did you kind of roll to the side and then roll

12:01:25 17  off the roof?

12:01:26 18     A.   Yeah --

12:01:26 19     Q.   Or did you --

20     A.   Kind of.

12:01:28 21     Q.   -- roll off face first?

12:01:30 22     A.   I kind of rolled to the side.

12:01:31 23     Q.   So you sort of rolled to the side and fell off

12:01:32 24  the roof?

12:01:33 25     A.   Yeah.

12:42:03 1    altercation between you --

2         A.    No.

12:42:04 3        Q.    -- and the officer?

12:42:04 4        A.    We wrecked.  We hit cars.

12:42:07 5        Q.    Oh, got it.

6         A.    Yeah.

12:42:07 7        Q.    So can you tell me about the resisting arrest

12:42:11 8    charge then.  What happened in that incident?

12:42:13 9        A.    That's -- are you talking about the one that I

12:42:15 10   just recently -- I don't know which one you're talking

12:42:20 11   about.  The one I just signed for this time?

12:42:25 12       Q.    I have that it occurred on December 2nd, 2016.

12:42:30 13       A.    2016?

12:42:30 14       Q.    Yeah.

12:42:31 15       A.    All right.  So, yeah, that's the one I signed for

12:42:35 16   this term.  I signed for aggravated assault and resisting

12:42:41 17   arrest.

12:42:41 18       Q.    Okay.  Well, what happened in the incident when

12:42:45 19   you were charged with resisting arrest?

12:42:46 20       A.    He tried to pull me over, and I took off running

12:42:51 21   and got away.  But it was my car.  I ran.  I mean, it was

12:42:55 22   under my name.  And that's what he got me for, resisting

12:42:59 23   arrest.

12:43:00 24       Q.    Okay.  And before you -- moving back up to the

12:43:05 25   March 10th incident, before you ran out the back door of

12:43:09 1    Jordan's house, did Ashley warn you that the cops were

12:43:13 2    coming?

12:43:13 3        A.    Yes.

12:43:14 4        Q.    What did she say?

12:43:15 5        A.    She says that -- she was -- as I was coming up to

12:43:17 6    the window, she was opening the door.  And she said that

12:43:21 7    the cops were -- she said the cops were here.  That's when

12:43:24 8    I ran out the back door.

12:43:25 9        Q.    And I just want to confirm that you never heard a

12:43:30 10   dog bark before you fell off the roof?

12:43:32 11       A.    No.

         12   Q.    So --

12:43:40 13       A.    I just can't really remember, see.

12:43:43 14       Q.    Before we took a break for lunch, one of your

12:43:45 15   attorneys helpfully pointed out that we have a video of

12:43:50 16   this entire incident; do you remember that?

12:43:50 17       A.    Yes.

12:43:51 18       Q.    And you watched that video this morning?

12:43:52 19       A.    Uh-huh.

12:43:53 20       Q.    Because one thing I want to ask you about are the

12:43:55 21   number of inconsistencies between the video, your

12:43:59 22   testimony here today, and then the admissions that you've

12:44:01 23   made in this case already.

12:44:03 24       A.    Okay.

12:44:04 25       Q.    So, for example, and I'm looking at these

1          A.    No.

12:48:43  2          Q.    But at this moment where we are in time, is there

12:48:46  3    anything else that the cops are doing to you at that

12:48:48  4    moment?

12:48:48  5          A.    They're grabbing my hands.  At the same time,

12:48:51  6    again, they were grabbing my hands, and they were

12:48:53  7    handcuffing me.

12:48:53  8          Q.    Okay.  So did one cop grab both of your hands or

12:48:58  9    two cops --

12:48:58 10          A.    I -- I can't tell you that.

11          Q.    Okay.

12:49:01 12          A.    I just know I was getting handcuffed.  And they

12:49:01 13    kept telling me to stop resisting, but I wasn't resisting.

12:49:08 14          Q.    So either one or more officers grabbed both of

12:49:12 15    your hands?

12:49:12 16          A.    Yes.

12:49:13 17          Q.    And what did they do with them?

12:49:14 18          A.    Handcuffed me.

12:49:15 19          Q.    Did they pull them behind your back?

12:49:17 20          A.    Yes.

12:49:18 21          Q.    At your lower back?

12:49:19 22          A.    Behind my back.

12:49:21 23          Q.    Okay.  Were they low or high?

12:49:23 24          A.    Yes.  Yeah, behind my back.

12:49:25 25          Q.    Okay.  And what happened next?

12:53:50  1        Q.    Were you moving your leg around?

12:53:52  2        A.    I can't remember.

12:53:54  3        Q.    Were you just laying still?

12:53:56  4        A.    I can't remember.

12:53:56  5        Q.    How many times did the K-9 bite you?

12:54:00  6        A.    Enough to tear half my calf muscle off.

12:54:06  7        Q.    Well, was that just one bite or multiple bites?

12:54:08  8   Do you know?

12:54:08  9        A.    It felt like multiple.

12:54:10 10        Q.    Okay.  It felt like multiple bites?

         11        A.    Yeah.

12:54:15 12        Q.    And your testimony is that when the dog was

12:54:17 13   biting you, you were handcuffed?

12:54:19 14        A.    Yes.

12:54:20 15        Q.    Do you have -- do you have any estimate of how

12:54:28 16   long the dog bit you for?

12:54:31 17        A.    No, I don't.

12:54:33 18        Q.    And as the dog is biting your leg, do you hear

12:54:39 19   any commands from the police officers?

12:54:41 20        A.    They're telling me to stop resisting.

12:54:44 21        Q.    Did you hear them say anything else?

12:54:49 22        A.    Just stop resisting.

12:54:51 23        Q.    Is there anything else that happened that we

12:54:59 24   haven't talked about before the dog let go of your leg up

12:55:02 25   until this point?



**EXHIBIT C**

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Carlos Castro,                          )
                                        )
                Plaintiff,              )
                                        )   Case No:
        - vs -                          )   2:18-cv-00753-SRB
                                        )   (ESW)
The State of Arizona, et al.,           )
                                        )
                Defendants.             )
_____)


VIDEOTAPED DEPOSITION OF ASHLEY SELENA BENTON

Goodyear, Arizona
August 1, 2019
10:44 a.m.

Reported by:
Deborah Cleary, RPR/CR
Certified Reporter
Certification No. 50663

11:42:44 1    want to leave me.

11:42:45 2         Q.   Would he tell you this directly?

11:42:46 3         A.   Yes.

11:42:47 4         Q.   What would he say?

11:42:48 5         A.   That it would hurt him to know that I was out

11:42:53 6    here by myself going through everything I was going

11:42:55 7    through.

11:42:56 8         Q.   And what would you say in response to that?

11:42:57 9         A.   I can't remember.

11:43:00 10        Q.   Ultimately, though, you couldn't get him to get

11:43:07 11   back in touch with his parole officer?

11:43:09 12        A.   No.

11:43:09 13        Q.   Did Carlos ever have a gun that you saw with him

11:43:13 14   from March 1st to March 3rd of 2017?

11:43:16 15        A.   No.

11:43:16 16        Q.   Did you ever see him have a weapon of any kind --

11:43:20 17        A.   No.

11:43:21 18        Q.   -- during that time?

11:43:21 19        A.   No.

11:43:22 20        Q.   So I want to talk about what happened on March

11:43:27 21   3rd, 2017, outside of your parents' house.  Do you

11:43:29 22   remember that incident?

11:43:30 23        A.   Yes.

11:43:30 24        Q.   Roughly what time did you arrive at your parents'

11:43:35 25   house?

| | | | |
|---|---|---|---|
| 11:43:35 | 1 | A. | I don't know.  It was during the day. |
| 11:43:38 | 2 | Q. | Would you say afternoon, morning? |
| 11:43:42 | 3 | A. | I don't remember. |
| 11:43:44 | 4 | Q. | It was -- the sun was out at least? |
| 11:43:47 | 5 | A. | Yes. |
| 11:43:47 | 6 | Q. | And was Carlos with you at the time? |
| 11:43:49 | 7 | A. | My friend Eric was with me.  We were going to get |
| 11:43:53 | 8 | | Carlos. |
| 11:43:54 | 9 | Q. | And did you ever get Carlos that day? |
| 11:43:55 | 10 | A. | Later. |
| 11:43:56 | 11 | Q. | What time roughly? |
| 11:43:58 | 12 | A. | I -- I don't know.  The sun was still out. |
| 11:44:03 | 13 | Q. | Okay.  Still during the day then? |
| 11:44:05 | 14 | A. | Uh-huh. |
| 11:44:06 | 15 | Q. | And why were you going to get Carlos? |
| 11:44:08 | 16 | A. | So we could see each other. |
| 11:44:09 | 17 | Q. | Why wasn't Carlos with you already at the time? |
| 11:44:13 | 18 | A. | I had just dropped him off at a friend's house. |
| 11:44:18 | 19 | Q. | Was he just going to hang out with the friend -- |
| | 20 | A. | Yeah. |
| 11:44:22 | 21 | Q. | -- as far as you knew? |
| 11:44:22 | 22 | A. | Yeah. |
| 11:44:23 | 23 | Q. | And then why were you going to go pick him up |
| 11:44:25 | 24 | | again? |
| 11:44:25 | 25 | A. | So we could just spend time together. |

11:44:28 1     Q.   So what happened, I guess, during that point?

11:44:33 2     A.   I picked him up.  And I stopped by my dad's

11:44:36 3 house, again, because my brother was going to change the

11:44:39 4 oil in my truck.

11:44:40 5     Q.   So who was all present in the car that you

11:44:42 6 arrived --

11:44:43 7     A.   Eric and Carlos.

11:44:44 8     Q.   -- at your parents' house?  Okay.  Where was --

11:44:46 9 who was driving?

11:44:46 10    A.   Eric.

11:44:47 11    Q.   And were you in the front passenger seat?

11:44:50 12    A.   Yes.

11:44:50 13    Q.   Where was Carlos?

11:44:52 14    A.   In the backseat.

11:44:52 15    Q.   And what happened when you guys all got there?

11:44:55 16    A.   My older brother was there and --

11:44:59 17    Q.   Which brother?

11:45:00 18    A.   William.  We got in an argument.  He was going to

11:45:03 19 hit me with a river rock.  And I heard a loud shot.  And

11:45:10 20 my brother threw the rock at my car instead, and I ran to

11:45:15 21 the car, and we took off.

11:45:19 22    Q.   That was it?

11:45:21 23    A.   Yeah.

11:45:21 24    Q.   Did anyone fire a gunshot?

11:45:24 25    A.   Yes.

11:45:26  1          Q.   Who did?

11:45:26  2          A.   I don't know who.

11:45:27  3          Q.   Do you remember roughly how many shots were

11:45:33  4     fired?

11:45:33  5          A.   I think five.

11:45:34  6          Q.   Now were they all in quick succession like bang,

11:45:38  7     bang, bang, or was it one or two shots and then there was

11:45:41  8     a pause and other shots were fired?

11:45:43  9                    MR. RUNDALL:   Objection.   Form.

11:45:44 10          A.   I can't remember.   Everything happened so fast.

11:45:46 11     BY MR. HORN:

11:45:46 12          Q.   Where were you in the car when the shots were

11:45:49 13     fired, if you re --

11:45:50 14          A.   I was outside the car.

11:45:51 15          Q.   Okay.   Can you -- do you remember roughly where

11:45:54 16     you were in relation to the car?

11:45:55 17          A.   The back of the car in the driveway.

11:45:57 18          Q.   When you say "the back of the car," like near the

11:46:00 19     trunk?

11:46:00 20          A.   Yes.

11:46:01 21          Q.   And could you tell from the sound which side of

11:46:04 22     the car the shots came from?

11:46:06 23          A.   No.

11:46:07 24          Q.   After you heard the shots, you said you got in

11:46:12 25     the car?

11:46:12  1     A.   We ran to the car, and we took off.

11:46:14  2     Q.   Roughly -- strike that.  Which --

11:46:16  3          Do you remember which door you got into?

11:46:19  4     A.   The passenger.

11:46:20  5     Q.   The front passenger seat?

11:46:22  6     A.   Yes.

11:46:22  7     Q.   Where was Eric at the time?

11:46:25  8     A.   In the driver's seat.

11:46:26  9     Q.   Where was Carlos at the time?

11:46:27 10     A.   In the backseat.

11:46:28 11     Q.   And did you -- when you first got into the car,

11:46:31 12 did you get a good look at Eric?

11:46:33 13     A.   Yes.

11:46:34 14     Q.   Did you get a good look at Carlos?

11:46:36 15     A.   Yes.

11:46:36 16     Q.   Were either of them holding a weapon?

11:46:39 17     A.   No.  It was in the center console.

11:46:42 18     Q.   And did either Eric or Carlos say anything?

11:46:46 19     A.   No.

11:46:46 20     Q.   So who decided to leave then?

11:46:50 21     A.   I dropped them both off and started my vehicle.

11:46:55 22     Q.   If you were in the front passenger seat, how

11:46:57 23 could you drop them off?

11:46:58 24     A.   I had them drive -- Eric drove me to a house in

11:47:03 25 Glendale.  They both got out.  And I took off in my car

11:47:06  1    and surrendered it.

11:47:09  2         Q.   Did anyone say anything during that time?

11:47:11  3         A.   No.  Everybody was quiet.

11:47:13  4         Q.   Just complete silence --

11:47:15  5         A.   (Witness nods head.) Yes.

11:47:16  6         Q.   -- in the car?

11:47:17  7         A.   Yes.

11:47:17  8         Q.   You didn't ask who fired the shots?

11:47:19  9         A.   No.

11:47:20 10         Q.   No one said --

11:47:20 11         A.   I was in shock.

11:47:22 12         Q.   And no one said anything about who fired the

11:47:25 13    shots?

11:47:25 14         A.   No.

11:47:26 15         Q.   Now are you -- do you remember talking to a

11:47:35 16    Detective Brandt from Peoria Police Department?

11:47:37 17         A.   Yes.

11:47:37 18         Q.   Do you remember talking to him that same day,

11:47:39 19    that same night --

         20         A.   Yes.

11:47:39 21         Q.   -- of March 3rd, 2017?

11:47:40 22         A.   Yes.

11:47:40 23         Q.   Do you remember giving him a statement about what

11:47:43 24    happened?

11:47:43 25         A.   Yes.

11:47:43  1          Q.    Do you remember what you said?

11:47:44  2          A.    Not all of it.

11:47:47  3          Q.    Do you remember mentioning that Eric was with you

11:47:49  4   at the time?

11:47:49  5          A.    Yes.

11:47:50  6          Q.    Do you remember mentioning that Carlos was not

11:47:53  7   with you at the time?

11:47:53  8          A.    Yes.

11:47:54  9          Q.    Why did you say that Carlos was not with you?

11:47:58 10          A.    Because he was on the run.

11:48:02 11          Q.    Were you lying to protect Carlos?

11:48:09 12          A.    Yes.

11:48:10 13          Q.    In fact, do you remember saying that Eric was the

11:48:17 14   one who fired the shots?

11:48:18 15          A.    Yes.

11:48:19 16          Q.    Why were you lying to protect Carlos?

11:48:32 17          A.    I didn't want to lose him.

11:48:34 18          Q.    To what?

11:48:34 19          A.    Going back to prison.

11:48:36 20          Q.    From his -- from absconding from parole?

11:48:40 21          A.    Yes.

11:48:40 22          Q.    Or something else also?

11:48:42 23          A.    I don't know how to answer that.  I just knew he

11:48:49 24   would go to jail if they had found him.

11:48:51 25          Q.    Were you concerned at all that if police believed

11:48:55 1  you that Eric was the shooter that they might arrest Eric?

11:48:59 2      A.    No.

11:48:59 3      Q.    Why not?

11:49:00 4      A.    Because I didn't know who shot.  So if they were

11:49:05 5  going to arrest anyone, I mean, I wasn't going to go to

11:49:10 6  jail for it.

11:49:12 7      Q.    That you were going to go to jail for it?

11:49:13 8      A.    I wasn't going to go to jail for it, so I'd given

11:49:17 9  Eric's name.

11:49:17 10     Q.    But you weren't concerned that Eric might have

11:49:20 11 been arrested?

11:49:21 12     A.    If Eric was arrested and interrogated and if he

11:49:26 13 wasn't the shooter, then that would have came out.  But it

11:49:29 14 wouldn't have been me.

11:49:31 15     Q.    You weren't concerned that if Eric was arrested

11:49:34 16 that they might not have believed him?

11:49:37 17     A.    I didn't think that far into it.

11:49:39 18     Q.    You weren't concerned that police might have

11:49:41 19 believed you that Eric was the shooter?

11:49:44 20     A.    I don't know.  I...

11:49:47 21     Q.    Do you remember specifically swearing to God in

11:49:54 22 your conversation with Detective Brandt that Carlos was

11:49:58 23 not with you that night?

11:49:59 24     A.    Yes.

11:49:59 25     Q.    And do you remember specifically saying that

11:50:04  1    Carlos was not with you for the past six days prior to

11:50:07  2    March 3rd, 2017?

11:50:08  3        A.    Yes.

11:50:09  4        Q.    Neither of those things were true; correct?

11:50:13  5        A.    No.

11:50:13  6        Q.    And when you say "no," was that those weren't

11:50:16  7    true?

11:50:16  8        A.    Those weren't true.

11:50:18  9        Q.    Are you aware that Detective Brandt and another

11:50:29 10    police officer spoke to your family members who were there

11:50:30 11    at your house that -- or your parents' house that day?

11:50:31 12        A.    Yes.

11:50:31 13        Q.    And are you aware that your father like

11:50:33 14    positively identified Carlos as the shooter?

11:50:35 15        A.    Yes.

11:50:36 16        Q.    Are you aware that your brother BJ, William, also

11:50:40 17    identified Carlos as the shooter?

11:50:41 18        A.    Yes.

11:50:42 19        Q.    And are you aware that Stormy also identified

11:50:44 20    Carlos as the shooter?

11:50:45 21        A.    Yes.

11:50:46 22        Q.    Are you aware that Stormy told police that Carlos

11:50:51 23    called him after the incident and tried to blame in this

11:50:55 24    phone call, voice mail, that he left with Stormy at his

11:50:59 25    phone that Carlos tried to blame Eric for it, for the

12:07:56  1     Q.   Do you know if Carlos finished his can?

12:07:59  2     A.   Yes.

12:07:59  3     Q.   How do you know?

12:08:00  4     A.   Because we both finished them.

12:08:03  5     Q.   You heard or saw that it was empty?

12:08:06  6     A.   Yes.

12:08:06  7     Q.   Do you know which one, if you heard it or you saw

12:08:09  8  it?

12:08:09  9     A.   Saw it.  We threw them away.

         10          MR. HORN:  Okay.

         11          THE COURT REPORTER:  Saw it what?

         12          THE WITNESS:  We threw them away.

12:08:14 13  BY MR. HORN:

12:08:14 14     Q.   Okay.  Now I want to rewind a little bit to go

12:08:26 15  back to earlier that day on March 10th, 2017.  Do you

12:08:29 16  remember being at the Arrowhead Mall in Glendale with

12:08:33 17  Carlos?

12:08:34 18     A.   Yes.

12:08:34 19     Q.   Do you know roughly what time you were there at

12:08:37 20  the mall with Carlos?

12:08:38 21     A.   No.

12:08:38 22     Q.   Specifically around 4:00 o'clock, 4:00 p.m., do

12:08:43 23  you remember any sort of incident happening at the mall

12:08:45 24  with Carlos?

12:08:46 25     A.   Yes.

12:08:46 1      Q.   What happened?

12:08:47 2      A.   He was going to take some shoes but then he threw

12:08:51 3  them.  And when he was walking out of the store, two guys

12:08:54 4  approached him from both sides.

12:08:56 5      Q.   Let's unpack that a little bit.  When you say "he

12:09:00 6  was going to take some shoes," does that mean he was going

12:09:02 7  to buy them?

12:09:03 8      A.   No.  He was going to steal them, and then he

12:09:05 9  decided not to and put them down.  And when he was walking

12:09:08 10 out, there was two men on both sides of the door that

12:09:11 11 approached him.

12:09:12 12     Q.   Now when you say he "put them down," do you know

12:09:15 13 roughly where he put them down?

12:09:16 14     A.   I was outside.

12:09:17 15     Q.   It was outside?

16     A.   I was outside.

12:09:19 17     Q.   Okay.  So how do you know he took the shoes?

12:09:20 18     A.   He said -- because we were in the store

12:09:22 19 originally together.  And he said he wasn't going to do it

12:09:26 20 and threw them in front of the door, I'm assuming, because

12:09:29 21 as soon as he walked out, he had nothing on him.

12:09:31 22     Q.   Okay.  Let's rewind a little bit because I just

12:09:34 23 want to make sure I'm clear on what you saw as opposed to

12:09:38 24 what just you might have heard.

12:09:40 25          When you were in the store with Carlos, did he

12:09:42 1    say anything about taking shoes --

12:09:44 2        A.    Yes.

12:09:44 3        Q.    -- to you?  What did he say?

12:09:45 4        A.    He was going to take a pair of shoes.

12:09:48 5        Q.    Is that exactly what he said, "I'm going to take

12:09:50 6    a pair of shoes"?

12:09:50 7        A.    Yeah, even though he had the money to buy them.

12:09:54 8    I told him he's stupid.  So I left him in the store.

12:09:57 9        Q.    And do you know what happened inside the store

12:09:59 10   then?

12:10:00 11       A.    No.

12:10:00 12       Q.    Did you see anything?

         13       A.    No.

12:10:00 14       Q.    Did you hear anything from outside?

12:10:02 15       A.    No.

12:10:02 16       Q.    And then as soon as -- I guess, at what point did

12:10:08 17   Carlos leave the store then?

12:10:09 18       A.    Shortly after.  We were arguing on the phone

12:10:12 19   because I told him he was an idiot.  We had the money for

12:10:16 20   it.  And he came and he was like, "Fine, let's go," and

12:10:18 21   hung up his phone and told me to meet him out front.  When

12:10:25 22   he come walking out with nothing in his hands, then two

12:10:25 23   guys attacked him from both sides.

12:10:27 24       Q.    Okay.  So at a certain point after you left him,

12:10:30 25   you called Carlos?

12:10:31 1    A.    He called me.

12:10:32 2    Q.    Okay.  And why did --

3    A.    We were arguing --

12:10:35 4    Q.    -- he call you?

12:10:36 5    A.    -- over the situation.

12:10:37 6    Q.    What situation?

12:10:38 7    A.    Of him wanting to take the shoes.

12:10:40 8    Q.    Okay.  And what did he say?

12:10:41 9    A.    He said, "All right.  Well, then meet me out

12:10:45 10   front then."

12:10:46 11   Q.    And what did you say?

12:10:47 12   A.    I said, "All right.  We're leaving.  I'm not

12:10:49 13   doing this today."

12:10:51 14   Q.    And is that when you hung up?

12:10:53 15   A.    Yeah.

12:10:54 16   Q.    Okay.  And then what happened right after you

12:10:55 17   hung up?

12:10:56 18   A.    When I was getting ready to pull up front, two

12:10:59 19   guys come from both sides of the doorway.  He was walking

12:11:01 20   out, and the fight broke out.

12:11:02 21   Q.    When you say "two guys," how do you know who they

12:11:05 22   were?

12:11:05 23   A.    I don't know who they were.

24   Q.    Okay.

12:11:06 25   A.    There were two guys.

12:11:07  1          Q.   Were they just dressed in --

12:11:08  2          A.   Regular clothes.

12:11:09  3          Q.   -- regular clothes?  They didn't wear any sort of

12:11:11  4   uniform or badge or anything?

12:11:13  5          A.   No.

12:11:13  6          Q.   And what happened?

12:11:14  7          A.   They grabbed him.  And he swung on one of them,

12:11:18  8   and they walked away for -- oh, he ran to the car.

12:11:23  9          Q.   Did anyone say anything at this time while this

12:11:26 10   was all going down?

12:11:27 11          A.   I don't know.

12:11:28 12          Q.   They didn't say like "stop" or "don't move"?

12:11:30 13          A.   I didn't hear anything.

12:11:31 14          Q.   Okay.  Did Carlos say anything?

12:11:32 15          A.   No.

12:11:34 16          Q.   Like "I didn't do anything" or "leave me alone"?

12:11:37 17          A.   No.  His assumption was he was getting jumped as

12:11:41 18   soon as he walked out the store.  So I don't --

12:11:43 19          Q.   How do you know he assumed that?

12:11:44 20          A.   Because when we got in the car, he was still

12:11:47 21   clueless on who they were.

12:11:48 22          Q.   What did he say?

12:11:49 23          A.   He's like, "What the fuck was that shit?"

12:11:52 24          Q.   And then you just drove away?

12:11:55 25          A.   Yes.



**EXHIBIT D**

Scott A. Ewing
Law Office of Scott A. Ewing, PLC
5215 N Sabino Canyon Rd
Tucson, AZ 85750
State Bar No. 030375
(520) 777-3398
scott@azcivilrightsattorney.com

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Carlos Castro, | ) | |
| | ) | |
| Plaintiff, | ) | No. 2:18-cv-00753-SRB-ESW |
| | ) | |
| vs. | ) | PLAINTIFF'S RESPONSES |
| | ) | TO DEFENDANT'S REQUESTS |
| | ) | FOR ADMISSION |
| The State of Arizona, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

Plaintiff Carlos Castro provides the following responses to Defendant's requests for Admission.

**REQUEST FOR ADMISSION NO. 1**

Admit that on March 11, 2017, you were a member of a street gang.

Admit __X__ Deny ____

**REQUEST FOR ADMISSION NO. 2**

Admit that you did not have your civil right to legally possess firearms restored prior to March 11, 2017.

Admit __X__ Deny ____

1

**REQUEST FOR ADMISSION NO. 3**

Admit that you possessed and fired a handgun on March 3, 2017.

Admit _X__ Deny _____

**REQUEST FOR ADMISSION NO. 4**

Admit that the document attached hereto as Exhibit 1, Bates Nos. STATE001208- 1212, is a genuine, true, and accurate copy of the Judgment entered by the Maricopa County Superior Court in case number CR2017-005716-001.

Admit __X__ Deny _____

**REQUEST FOR ADMISSION NO. 5**

Admit that the document attached hereto as Exhibit 2, Bates Nos. STATE0002533-2536, is a genuine, true, and accurate copy of the Judgment entered by the Maricopa County Superior Court in case number CR2011-006917-001.

Admit __X__ Deny _____

**REQUEST FOR ADMISSION NO. 6**

Admit that the document attached hereto as Exhibit 3, Bates Nos, STATE002538- 2541, is a genuine, true, and accurate copy of the Judgment entered by the Maricopa County Superior Court in case number CR2012-048231-001.

Admit __X__ Deny _____

**REQUEST FOR ADMISSION NO. 7**

Admit that the document attached hereto as Exhibit 4, Bates Nos, STATE 2543- 2546, is a genuine, true, and accurate copy of the Judgment entered by the Maricopa County Superior Court in case number CR2011-148728-001.

Admit __X__ Deny _____

**REQUEST FOR ADMISSION NO. 8**

Admit that you used an illegal controlled substance on March 10, 2017.

Admit _X___ Deny _____

**REQUEST FOR ADMISSION NO. 9**

Admit that you were on community supervision (parole) on March 10, 2017.

Admit __X__ Deny ____

**REQUEST FOR ADMISSION NO. 10**

Admit that prior to March 10, 2017, you absconded from community supervision (parole).

Admit __X__ Deny ____

**REQUEST FOR ADMISSION NO. 11**

Admit that on March 10, 2017, you stole or attempted to steal merchandise from a JC Penny's store.

Admit ____ Deny ____

Plaintiff invokes his 5th Amendment right to remain silent.

**REQUEST FOR ADMISSION NO. 12**

Admit that on March 10, 2017, you assaulted a JC Penny's store employee.

Admit ____ Deny ____

Plaintiff invokes his 5th Amendment right to remain silent.

**REQUEST FOR ADMISSION NO. 13**

Admit that you ran out the back door of 4627 W. Palmaire Ave in Glendale, AZ in the evening of March 10, 2017 when police arrived.

Admit __X__ Deny ____

**REQUEST FOR ADMISSION NO. 14**

Admit that police eventually located you on the roof of a house in the evening of March 10, 2017 or early morning hours of March 11, 2017.

Admit __X__ Deny ____

**REQUEST FOR ADMISSION NO. 15**

Admit that you heard police commands to immediately come down from the roof.

Admit __X__ Deny ____

**REQUEST FOR ADMISSION NO. 16**

Admit that you did not obey police commands to immediately come down from the roof.

Admit __X__ Deny _____

**REQUEST FOR ADMISSION NO. 17**

Admit that a Taser was deployed twice before you complied with police commands to come down from the roof.

Admit __X__ Deny _____

**REQUEST FOR ADMISSION NO. 18**

Admit that once on the ground after you came down from the roof, you heard police commands to put your hands behind your back.

Admit __X__ Deny _____

**REQUEST FOR ADMISSION NO. 19**

Admit that once on the ground after you came down from the roof, you did not immediately obey police commands to put your hands behind your back.

Admit __X__ Deny _____

**REQUEST FOR ADMISSION NO. 20**

Admit that before officers took you into custody on the evening of March 10, 2017 or early morning hours of March 11, 2017, you heard multiple police warnings that they would release the police canine if you did not comply with their commands.

Admit __X__ Deny _____

**REQUEST FOR ADMISSION NO. 21**

Admit that you were kicking your legs when the police canine bit your calf.

Admit _____ Deny __X__

He was not kicking prior to the police canine biting his calf. However a police officer did take hold of his foot and hold his leg so that the dog could bite it.

**REQUEST FOR ADMISSION NO. 22**

Admit that when a police canine bit your calf, you did not immediately put your hands behind your back.

Admit __X__ Deny ____

**REQUEST FOR ADMISSION NO. 23**

Admit that you kicked the police canine that was biting your leg.

Admit __X__ Deny ____

**REQUEST FOR ADMISSION NO. 24**

Admit that you never told police that you were unarmed at any point before you were taken into custody on March 11, 2017.

Admit ____ Deny _X__

Carlos Castro denies this because he took his shirt off, raised his hands, and said "I'm done" repeatedly for the express purpose of showing that he was unarmed and was surrendering to the authority of the police.

**REQUEST FOR ADMISSION NO. 25**

Admit that at some point prior to your arrest, while you were on the ground after you came down from the roof, you put both hands underneath your body.

Admit ____ Deny __X__

Carlos Castro did not put his hands under his body while he was on the ground after he came down off the roof. Carlos Castro's arms were out to the side and the police officers on top of him had complete control of his arms.

DATED: March 6, 2019

By: _____

_____
SCOTT A. EWING
*Attorney for Plaintiff*
Law Office of Scott A. Ewing, PLC
5215 N Sabino Canyon Rd
Tucson, AZ 85750
(520) 777-3398

5

# EXHIBIT E

1  Mark Brnovich
   Attorney General
2
   Michael Tryon (003109)
3  Jeremy Horn (024707)
   Rebecca Banes (034212)
4  Assistant Attorneys General
   2005 North Central Avenue
5  Phoenix, Arizona 85004-1592
   Telephone: (602) 542-8355
6  Fax:  (602) 542-3393
   DefensePhx@azag.gov
7  Michael.Tryon@azag.gov
   Jeremy.Horn@azag.gov
8  Rebecca.Banes@azag.gov
   *Attorneys for State Defendants*
9

10            **IN THE UNITED STATES DISTRICT COURT**

11               **FOR THE DISTRICT OF ARIZONA**

12  Carlos Castro,                          Case No:  CV-14-01960-PHX-SRB

13                    Plaintiff,            **DECLARATION OF JEREMY HORN
                                            IN SUPPORT OF STATE
14  v.                                      DEFENDANTS' MOTION FOR
                                            SUMMARY JUDGMENT**
15  The State of Arizona and Brad Martin, in
    his individual capacity and as an
16  employee of the Arizona Department of
    Public Safety,
17
                    Defendants.
18

19          I, Jeremy Horn, declare as follows:

20          1.      I am an Assistant Attorney General at the Arizona Attorney General's

21  Office, counsel for Defendants State of Arizona and Brad Martin.

22          2.      Attached and hereby incorporated by reference as Exhibit F is a fair and

23  accurate copy of a police body camera video, depicting portions of the subject incident,

24  taken in the early morning hours of March 11, 2017, STATE000441, produced by State

25  Defendants in discovery.  The video has a runtime of 20 minutes and 40 seconds.

26

27

28

3.     Attached and hereby incorporated by reference as Exhibit G are fair and accurate depictions of thirty (30) still image screenshots taken from the police body camera video in Exhibit F.

Executed on September 30th, 2019, in Phoenix, Arizona.


s/ Jeremy Horn




DATED this 30th day of September, 2019.

Mark Brnovich
Attorney General


s/ Jeremy Horn
Michael Tryon
Jeremy Horn
Rebecca Banes
*Attorneys for State Defendants*


**CERTIFICATE OF SERVICE**

I hereby certify that on September 30, 2019, I electronically transmitted the foregoing documents to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the CM/ECF registrants on record.


By s/Diane Mari

#8204706

2