**NOT FOR PUBLICATION**

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Carlos Castro, | No. CV 18-00753-PHX-SRB (ESW) |
| Plaintiff, | |
| v. | **ORDER** |
| Arizona Department of Public Safety, et al., | |
| Defendants. | |

Plaintiff Carlos Castro, who is represented by counsel, brought this civil rights action pursuant to 42 U.S.C. § 1983 and Arizona state law. (Doc. 70.) Defendants move for summary judgment, and Plaintiff opposes. (Docs. 105, 114.)

The Court will deny the Motion for Summary Judgment.

**I.    Background**

In his Third Amended Complaint, Plaintiff names two Defendants: the State of Arizona and Arizona Department of Public Safety (DPS) employee Brad Martin. (Doc. 70 ¶¶ 2-3.) Plaintiff alleges that during his arrest on March 10, 2017, Defendant Martin had his K9 unit bite Plaintiff's leg and the dog continued to bite Plaintiff's leg for 44 seconds. (*Id.* ¶¶ 9, 45, 61.) Plaintiff further alleges that, at the time, he was being held face down by officers on the ground, was complying with their orders, was not resisting, and was not armed. (*Id.* ¶¶ 35-37, 41-44.) Plaintiff suffered severe, permanently disfiguring injuries to his leg, has had multiple surgeries to treat the injuries to his leg, and will need further surgeries and physical therapy for his leg. (*Id.* ¶¶ 67-69.)

In Counts One, Two and Four, Plaintiff asserts vicarious liability state law claims against the State of Arizona for battery (Count One), intentional infliction of emotional distress (Count Two), and gross negligence (Count Four). (*Id.* ¶¶ 71-81, 90-98.) In Count Three, Plaintiff asserts a Fourth Amendment excessive force claim against Defendant Martin. (*Id.* ¶¶ 82-89.) Plaintiff seeks damages, attorneys' fees and costs.

## II.    Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co.*, *Ltd. v. Fritz Co.*, *Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co.*, *Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the court must believe the nonmovant's evidence and draw

all inferences in the nonmovant's favor. *Id.* at 255. The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

## III. Facts

### A. Plaintiff's Objections

The facts are taken from Defendants' Statement of Facts (DSOF) (Doc. 106), Plaintiff's Controverting Statement of Facts (PCSOF) and Separate Statement of Facts (PSSOF) (Doc. 115), and Defendants' Response to Plaintiff's Controverting and Separate Statement of Facts (Doc. 121), as well as evidence submitted by the parties.

Plaintiff objects to several of Defendants' facts on the basis of relevance and as "overly prejudicial." (Doc. 115 ¶¶ 4-6, 8, 10, 12, 16-17.) Those facts address Plaintiff's prior criminal record, criminal convictions, gang membership, and an incident days before Plaintiff's arrest when police received a report that Plaintiff had argued with members of his girlfriend's family and fired four shots. Plaintiff argues that he "has already conceded his prior criminal past, but his past is not the focus of inquiry before the Court." (Doc. 115 ¶ 4.)

Defendants respond that Plaintiff's prior criminal conduct, gang membership, and recent felony convictions are relevant to whether Defendant Martin's use of force was justified and the threat Plaintiff posed to Martin and the other officers. (Doc. 121 ¶ 4, citing *Graham v. Connor*, 49 U.S. 386, 396 (1989) ("The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.").) Defendants contend that Plaintiff "has not made any substantive argument how he would be unfairly prejudiced by the Court considering his own criminal and violent acts since they were the basis for why Plaintiff was wanted by police and why police approached him in the manner they did." (*Id.*)

The Court overrules Plaintiff's objections to DSOF paragraphs 4-6, 8, 10, 12, 16-17. Plaintiff's prior criminal history, criminal convictions, gang membership, and the events that preceded his arrest are relevant to the reasonableness of the use of force and Defendants' qualified immunity argument. *See Glenn v. Washington Cnty.*, 673 F.3d 864,

872 (9th Cir. 2011) (in evaluating whether an officer is entitled to qualified immunity "[t]he most important factor is whether the individual posed an immediate threat to the safety of the officers or others") (internal citation an quotation marks omitted).  Additionally, because the excessive force analysis hinges on what a reasonable officer would have done under the facts known to him or her at the time, the Court must take an individualized approach to each Defendant, considering only those facts known to him or her at the time of the arrest. *Graham*, 49 U.S. at 396.  Accordingly, where the evidence shows Defendant Martin had knowledge of particular facts, these facts must be considered.  But where the evidence does not establish such knowledge, such facts will not be considered and will not prejudice Plaintiff.

### B.   Video Evidence

Where the parties' versions of events differ, the Court takes Plaintiff's facts as true. *See Anderson*, 477 U.S. at 255.  In this case, there is also video footage of the incident giving rise to Plaintiff's excessive force claim.  (*See* Doc. 106, Defs.' Ex. F (Video); Doc. 115, Pl. Ex. 2 (Video).)[1]  The Court considers the facts in the light depicted by the video, but still draws all inferences from the video in Plaintiff's favor.  *See Scott v. Harris*, 550 U.S. 372, 380–81 (2007) (a court may properly consider video evidence in ruling on a motion for summary judgment and should view the facts "in the light depicted by the videotape"); *Williams v. Las Vegas Metro. Police Dep't*, No. 2:13-CV-1340-GMN-NJK, 2016 WL 1169447, at *4 (D. Nev. Mar. 22, 2016) ("[t]he existence of the video does not change the usual rules of summary judgment: in general, the court will draw all reasonable inferences from the video in plaintiff's favor") (citing *Blankenhorn v. City of Orange*, 485 F.3d 463, 468 n.1 (9th Cir. 2007)).

. . . .

. . . .

---

[1] The two exhibits appear to be video from the same body camera, but Defendants' exhibit provides a longer excerpt, which includes the search for Plaintiff before Plaintiff was found on the roof of a house until shortly after his arrest.  Plaintiff's video begins at the time Plaintiff was found on the roof until after his arrest.

C. Relevant Facts

Defendant Martin has been a K9 handler for DPS since January 2016; prior to that, he was a K9 handler for six years with the Ingham County Sheriff's Office in Michigan. (DSOF ¶ 1.) Between January 2016 and March 2017, K9 Storm, a Belgian Shepherd, had been on hundreds of deployments with Martin. (*Id.* ¶ 2.) Both Martin and Storm are certified annually as part of their continuing police training. (*Id.* ¶ 3.)

In March 2017, Plaintiff was known to officers in the State Gang Task Force ("GIITEM") due to his membership in the Peoria street gang "Dog Town." (*Id.* ¶ 4.) At that time, Plaintiff had multiple felony convictions, including Aggravated Assault on a Law Enforcement Officer, Theft of Means of Transportation, Theft, and Possession of Drug Paraphernalia, and had served just over four years in the Arizona Department of Corrections from 2012 to 2016. (*Id.* ¶¶ 5-6.) After Plaintiff's release from prison in 2016, he absconded from community supervision and a warrant for his arrest was issued. (*Id.* ¶ 7.) On December 2, 2016, Plaintiff resisted arrest and successfully fled from police as they tried to pull him over. (*Id.* ¶ 8.) After that, Plaintiff was also wanted for Resisting Arrest, a Class 6 Felony. (*Id.*)

On March 3, 2017, Plaintiff was at the home of the parents of his then-girlfriend, Ashley Benton. (*Id.* ¶ 9.) Although Plaintiff was a prohibited possessor due to his felony convictions, he had a 9 mm handgun in the car. (*Id.*) An argument ensued and Plaintiff, who was in the car, fired two shots, drove a short distance, and fired at least two more shots.[2] (*Id.*; Doc. 106-1 at 49 (Pl. Dep. at 92:12-15).) Plaintiff states that all four shots were fired into the air and that there is no evidence that he pointed a gun at any person or shot at any person. (PCSOF ¶ 9.) Police were called to the scene after the shooting and witnesses identified Plaintiff as the shooter. (DSOF ¶ 10.) Benton's family told officers that Plaintiff was a gang member, was wanted for a hit and run on a police officer, was connected to two homicides, addicted to drugs, owned a firearm, had previously assaulted

---

[2] The parties dispute who was involved in the argument, but that is not relevant to the Court's analysis.

Benton and threatened to kill the Benton family.  (*Id*.)  At the time, Plaintiff was intoxicated on methamphetamines.  (*Id*. ¶ 11.)  After this incident, Plaintiff was wanted for additional felonies: Aggravated Assault with a Deadly Weapon, Misconduct Involving Weapons, and Endangerment.  (*Id*. ¶ 12.)  Plaintiff later pleaded guilty to Aggravated Assault with a Deadly Weapon related to this incident.  (*Id*. ¶ 10.)

On March 10, 2017, GIITEM police learned that Plaintiff had committed a strong-arm robbery and assaulted a store employee at a Glendale, Arizona JC Penney.  (*Id*. ¶ 13.) Plaintiff disputes this statement, asserting that he has never been convicted of an assault or robbery at JC Penney (PCSOF ¶ 13), but Plaintiff does not dispute that this information was provided to GIITEM.

In response to the March 3, 2017 aggravated assault and the March 10, 2017 robbery and assault at JC Penney, police, on March 10, 2017, obtained a search warrant to locate Plaintiff through his cell phone.[3]  (DSOF ¶ 18.)  Plaintiff's cell phone was tracked to a house in Glendale, and Glendale Police officers confirmed Plaintiff was there.  (*Id*. ¶ 19.) Detectives obtained a residential search warrant for the house.  (*Id*. ¶ 20.)  Because of the nature of the crimes Plaintiff was suspected of, his criminal history, and because he was presumed to be armed, the DPS Special Weapons and Tactics (SWAT) team led the way for police in executing the search warrant.  (*Id*. ¶ 20.)  A GIITEM detective briefed the officers who were participating in the execution of the search warrant, including Defendant Martin, about the risk factors and Plaintiff's violence potential.  (*Id*. ¶ 24.)  They were briefed that Plaintiff was a documented gang member, had prior felony convictions including aggravated assault, had recently been released from prison and had absconded from community supervision, had an outstanding arrest warrant, was suspected of committing aggravated assault with a firearm the week before, and was suspected of committing a strong-arm robbery and an assault earlier that day.  (*Id*.)

---

[3] Plaintiff disputes DSOF ¶ 18, again asserting that he was never charged with or convicted of an assault and robbery at JC Penney (PCSOF ¶ 18), but he does not dispute that the alleged assault and robbery were part of the basis for the search warrant.

In his response to requests for admission, Plaintiff admitted that he was a gang member on March 11, 2017, but at his deposition, Plaintiff contradicted that admission, claiming that "in his own mind, he no longer considered himself a member of the Dog Town street gang in 2016." (*Id.* ¶¶ 25-26.) Plaintiff did admit to getting a Dog Town gang tattoo on his face while in jail after March 11, 2017, and numerous other Dog Town-related gang tattoos prior to that day, but he "agreed getting the face tattoo was a mistake." (*Id.* ¶ 27; PCSOF ¶ 27.) Nevertheless, Defendant Martin "knew that Plaintiff was a documented Dog Town gang member on March 10-11, 2017." (DSOF ¶ 28.)

On March 10, 2017, Plaintiff used methamphetamines earlier in the day and again that night at the Glendale house, along with heroin. (*Id.* ¶ 22.) Police arrived to execute the residential search warrant shortly after midnight on March 11, 2017. (*Id.* ¶ 29.) Just before their arrival, Plaintiff's girlfriend, who was also at the residence, warned Plaintiff that police were coming; Plaintiff looked out a window and saw SWAT officers throw flash grenades and Plaintiff fled out the back door of the house. (*Id.* ¶ 30.) Plaintiff testified that he fled from police because he was on the run after absconding from his community supervision and concerned about being arrested for the March 3, 2017 aggravated assault. (*Id.* ¶ 31.) Plaintiff hopped several fences into neighboring yards and then hid in a shed; Plaintiff heard police walk past the shed and the sound of a helicopter. (*Id.* ¶ 32.) Police then set up a perimeter to prevent Plaintiff's escape. (*Id.* ¶ 33.) Defendant Martin and K9 Storm searched the house and then the backyard of nearby homes. (*Id.*) At each location, Martin gave a warning that he was deploying his K9, stating "State police canine. Come to the sound of my voice now. If you do not, a K9 will be deployed and he will bite you." (*Id.*) Martin gave this warning eight times (*id.*), but while Plaintiff was hiding in the shed, he never heard officers give K9 commands or saw any K9s. (PCSOF ¶ 33.) Other officers informed Martin that suspected methamphetamines were found inside the house from which Plaintiff had fled, and, upon learning this, Martin believed Plaintiff might be under the influence of methamphetamines. (DSOF ¶ 35.)

After about ten minutes in the shed, Plaintiff left and "continued fleeing police by climbing a nearby backyard ladder onto the roof of a house," where he hid in the leaves and branches of an overhanging tree. (DSOF ¶ 36.) Plaintiff disputes that he "continue[d] fleeing" and states that he, instead, "climbed on top of the roof from the ladder in the backyard while determining how to surrender because he 'knew [he] was caught' and recognized that Officers were in the front." (PCSOF ¶ 36.)

The parties dispute much of what happened while Plaintiff was on the roof. According to Defendants, a police officer spotted Plaintiff on the roof and ordered him to come down, but Plaintiff did not obey the command. (DSOF ¶ 37.) Instead, Plaintiff moved away from the ladder he had used to climb up and walked toward the front of the house. (*Id.*) Plaintiff was then sitting on the roof, and officers ordered him to get down off the roof immediately, and Defendant Martin "gave Plaintiff commands to stop that Plaintiff did not obey." (*Id.* ¶ 38.) Plaintiff heard the police commands to get down off the roof but did not obey them and said, "I'm done" and raised his hands momentarily before putting them back down again. (*Id.* ¶¶ 39-40.) Plaintiff initially sat on the roof with his legs dangling over the edge, but as more officers arrived, he slid backwards away from the police and further up the roof. (*Id.* ¶ 43.) Plaintiff could see at least one police K9 standing on the ground in front of him and barking. (*Id.* ¶ 44.)

During this time, Defendant Martin continued to perceive Plaintiff as threat and believed that Plaintiff was armed due to his violent background and recent use of a firearm and because Plaintiff had not yet been searched. (*Id.* ¶ 45.) Although Plaintiff was not wearing a shirt, in Martin's experience, gang members typically do not carry handgun holsters but instead carried handguns in their pants, underwear, or around their ankles. (*Id.*) Also, Plaintiff was on the roof, above the officers commanding him to come down, and they did not have immediate cover to protect themselves if Plaintiff was armed and began opening fire. (*Id.*) Based on his training and experience, it appeared to Martin and other officers that Plaintiff was not actually surrendering to police "because he made no move to comply with police commands and come down from the roof or keep his hands up. Instead,

Defendant Martin "believed that Plaintiff was merely catching his breath and stalling for time while Plaintiff tried to figure out how he could continue to flee from police." (*Id.* ¶¶ 46-47.)

According to Plaintiff, he did not disobey the first order to come down from the roof; instead, by walking towards the front of the roof, he was walking towards the officer and was in the process of obeying the officer's commands. (PCSOF ¶ 37.) Plaintiff was given conflicting commands to both "stop" and get off the roof, but he nevertheless walked to the edge of the roof towards the officers and within their line of sight, sat down, put his feet over the edge of the roof, and said "I'm done." (*Id.* ¶ 38.) Plaintiff was well illuminated by a police spotlight. (*Id.* ¶ 45.) Plaintiff "repeatedly tried to comply with police commands and verbally surrendered to police, stating, 'I'm done' six times before being inappropriately Tasered off the roof." (*Id.* ¶ 46.)

Defendants respond that Plaintiff previously admitted to hearing and disobeying officers' commands to come down from the roof immediately and they cite to their Requests for Admissions in which Plaintiff admitted that he "heard police commands to immediately come down from the roof" and that he "did not obey police commands to immediately come down from the roof." (Doc. 121 ¶ 38; Doc. 106-1 at 111-12.) Although Plaintiff said, "I'm done," Plaintiff did not acknowledge police commands, did not come down from the roof, and did not keep his hands in the air. (Doc. 121 ¶ 46.)

According to Defendants, because Plaintiff was ignoring police commands to come down, one of the officers ordered a non-lethal measure be used to take Plaintiff into custody, and a Glendale police officer fired a Taser at Plaintiff. (DSOF ¶ 49.) The Taser had minimal effect on Plaintiff; Plaintiff said, "I'm done, I'm done," and again put his hands up briefly before putting them down again. (*Id.*) Because of the Taser's apparent ineffectiveness on Plaintiff and knowing that methamphetamines were found in the house from which Plaintiff had fled, Defendant Martin believed Plaintiff was under the influence of methamphetamines. (*Id.* ¶ 50.) Martin knew from his experience as a law enforcement officer that non-lethal police weapons such as Tasers can be less effective on suspects

intoxicated on drugs such as methamphetamines or heroin. (*Id.* ¶ 51.) An officer on the ground yelled to Plaintiff, "Come down and get down on your face or you're going to get bit!," and Plaintiff heard multiple other warnings that police would release a K9 if Plaintiff did not comply with their commands. (*Id.* ¶¶ 52-53.)

According to Plaintiff, he was not ignoring police commands but was attempting to comply with conflicting commands and that the Taser obviously had an effect on him because he cried out in pain upon being struck. (PCSOF ¶ 49.) Plaintiff does not dispute that an officer warned him to come down or he would get bit but states that he "was also given the conflicting command to 'stop.'" (*Id.* ¶ 52.) Two police dogs and at least ten officers "swarm[ed] Plaintiff from below with weapons drawn," and he did not reach for his waistband or pants pocket. (PSSOF ¶¶ 3-4, 6.) Also, while Plaintiff was attempting to comply with police commands to come down from the roof, an officer was heard telling one of the police dogs to "bite him, bite him, bite him." (*Id.* ¶ 7.) After Plaintiff was hit by the Taser, he cried out and repeated four times "I'm done" and that he did not want to fall off the roof. (*Id.* ¶ 8.) Plaintiff was struck by a second Taser round and fell from the roof less than a second later, falling about five feet from his position on the roof. (*Id.* ¶¶ 9-11.)

The parties further dispute what happened once Plaintiff was on the ground. Under Defendants' version, once Plaintiff was off the roof, he landed on his hands and feet and was tackled by DPS SWAT members Detective Headley and Trooper Engwis to keep him from escaping. (DSOF ¶ 55.) Officers then commanded Plaintiff to put his hands behind his back; Plaintiff heard the commands but did not obey them. (*Id.* ¶ 56.) Headley and Engwis saw Plaintiff trying to clench his arms beneath his torso, which prevented officers from gaining control of his hands and handcuffing him. (*Id.* ¶ 57.) Headley and Engwis commanded Plaintiff to stop resisting and Plaintiff heard at least some of these commands, but he continued to struggle with officers. (*Id.* ¶¶ 58-59.) Engwis punched Plaintiff in the head three times but Plaintiff still did not release his hands. (*Id.* ¶ 59.)

Defendant Martin saw officers struggling with Plaintiff and still believed Plaintiff might be armed based on Plaintiff's prior violent felony conviction and suspected aggravated assault with a deadly weapon a week earlier as well as his strong-arm robbery and assault earlier that day, his active resistance and continued failure to follow police commands, and because Plaintiff had not yet been searched for weapons. (*Id.* ¶ 60.) Plaintiff was yelling while police K9s, including Storm, were barking. (*Id.* ¶ 61.) Martin saw Plaintiff put his arms beneath his torso and kick with his legs, and Martin decided to deploy Storm on Plaintiff's lower leg as a pain compliance tool after observing Plaintiff continue to resist officers and not allowing them to handcuff him. (*Id.* ¶ 62.) Just before Martin deployed Storm, a Glendale police officer grabbed Plaintiff's left foot and briefly held his flailing leg still, and Storm then bit Plaintiff's left calf. (*Id.* ¶ 63.) Officers had not yet been able to place flex cuffs on Plaintiff. (*Id.*) Although Storm was biting his calf, Plaintiff did not immediately put his hands behind his back and continued to resist arrest; Plaintiff also kicked Storm multiple times while Storm was biting him. (*Id.* ¶ 64.) Officers continued to order Plaintiff to stop resisting, and eventually officers were able to gain control of both of Plaintiff's hands and place them into plastic flex cuffs. (*Id.* ¶¶ 65-66.) Once Plaintiff was in the flex cuffs, Martin put his arm around Storm and gave him the verbal command to release from the bite. (*Id.* ¶ 67.) Storm released from the bite, and Martin led Storm away. (*Id.*) Other officers picked Plaintiff up and led him to the street where medical personnel could treat him. (*Id.*) Defendants assert that it is unclear how long the K9 bite lasted but what is clear "is that Storm was released from the bite as soon as Plaintiff was handcuffed." (*Id.* ¶ 68.)

Plaintiff disputes that he was trying to escape after Headley and Engwis tackled him, and he states that he could not comply with their commands because the officers were holding his arms. (PCSOF ¶¶ 55-56.) Plaintiff could not clench his arms beneath his torso or otherwise resist officers' attempts to handcuff him because officers immediately grabbed his hands and maintained full control over them. (*Id.* ¶ 59.) Plaintiff disputes that Martin had any reason to fear Plaintiff was armed because Plaintiff was shirtless and fully

illuminated by the police helicopter while he was on the roof and when he was on the ground he was pinned on his stomach by at least four officers, which eliminated the possibility that he could retrieve a firearm from the front of his waistband and open fire on the officers. (*Id.* ¶ 60.) Plaintiff claims he was not resisting arrest but was reacting to being bitten by a dog who tore chunks out of his flesh and muscle, and the use of Storm exacerbated Plaintiff's arrest. (*Id.* ¶ 64.) Plaintiff asserts he was already cuffed when Storm bit him. (*Id.* ¶ 65.) Plaintiff contends the bite lasted 86 seconds, which Defendants dispute and point out that Plaintiff said in his Complaint that the bite lasted 44 seconds. (PCSOF ¶ 68; Doc. 121 ¶ 68.)

Defendants argue that Plaintiff's contention that he could not comply with officers' commands contradicts his admissions that he heard police commands to put his hands behind his back when he landed on the ground and that he disobeyed those commands. (Doc. 121 ¶ 56.) Defendants cite to Plaintiff's admissions to the following statements: (1) "Admit that once on the ground after you came down from the roof, you heard police commands to put your hands behind your back."; (2) "Admit that once on the ground after you came down from the roof, you did not immediately obey police commands to put your hands behind your back." (Doc. 106-1 at 107.) Defendants assert that Plaintiff did not qualify his admissions in any way such as by stating that he was unable to comply. (Doc. 121 ¶ 56.)

Plaintiff did not have a gun at the time of his arrest. (PSSOF ¶ 22.) "Because of the dog bite, Plaintiff suffered severe, permanently disfiguring injuries to his leg that have required multiple surgeries and extensive physical therapy to treat." (*Id.* ¶ 1.)

The Court has reviewed the body cam video provided by the parties and observes the following.[4] In the video excerpt provided by Plaintiff, which is three minutes and 29 seconds long, Plaintiff is first seen sitting on the sloped roof of a house with his legs

_____

[4] As noted, the video provided by Plaintiff and Defendants appear to be from the same camera, but Defendants' exhibit is longer. Because the relevant portion of the video begins when Plaintiff is found on the roof, and it is the same footage in both Plaintiff's and Defendants' exhibits, the Court will only refer to the shorter excerpt provided by Plaintiff.

hanging over the edge.  (Pl. Ex. 2 at Timestamp T07:38:19Z (10 seconds into the video).)
Several officers, including one with a K9, enter the scene and order Plaintiff to come down;
Plaintiff says several times, "I'm done," and pulls his knees and feet onto the roof, holds
his hands out and says, "I'm done."  (*Id*. at T07:38:19Z to T07:38:30Z (10 to 20 seconds
into the video).)  Plaintiff makes no moves to come down from the roof.  A Taser is fired,
striking Plaintiff, and he screams again, "I'm done, I'm done," and someone yells, "come
down and get on your face or you're gonna get bit" and Plaintiff says, "I'm done, I don't
want to fall."  (*Id*. at T07:38:32Z to T07:38:38Z (23 to 29 seconds into the video).)  Plaintiff
does not come down from the roof after being struck by the first Taser.

The view of Plaintiff is momentarily blocked by another officer in the frame, but
the sound of a second Taser shot is heard and Plaintiff falls off the roof, and four or five
officers rush to surround him; two officers with K9 units barking and lunging rush in as
well.  (*Id*. at T07:38:38Z to T07:38:47Z (29 to 38 seconds into the video).)  At timestamp
T07:38:52Z (43 seconds into the video), Plaintiff's right arm is seen outstretched, but his
left arm appears to be under his torso.  Plaintiff's hands are not yet cuffed behind his back.
At timestamp T07:38:54Z (45 seconds into the video), one of the K9 units bites Plaintiff's
leg.  Officers can be heard saying, "stop resisting" and "stop fighting."  At timestamp
T07:39:03Z (54 seconds into the video), it appears that one of the officers kneeling over
Plaintiff removes zipties from the back of his vest.  The view of the camera turns away
from Plaintiff for a time and at T07:39:28Z (1:19 seconds into the video), someone says,
"All right.  He's cuffed up."  At that time, Plaintiff appears to be lying still, but the K9 can
be seen with his mouth on Plaintiff's leg.  At T07:39:36Z (1:27 seconds into the video),
the K9 still has his head down over Plaintiff, and from T07:39:37Z  to T07:39:40Z (1:28
to 1:31 seconds into the video), the K9 is seen lifting Plaintiff's leg up with his mouth and
holding on.  After that, Plaintiff and the K9 are not in view, but Plaintiff can still be heard
screaming, "ow, ow" at T07:39:47Z (1:38 seconds into the video).  The next view of the
K9 that bit Plaintiff is at T07:39:54Z (1:46 seconds into the video) and he is no longer
holding Plaintiff's leg.

## IV.    Excessive Force (Fourth Amendment)

### A.    Legal Standard

A claim that law enforcement officers used excessive force in the course of an arrest is analyzed under the Fourth Amendment and its "reasonableness" standard. *Graham*, 490 U.S. at 395. This inquiry requires a "careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interest against the countervailing governmental interests." *Id.*

To determine whether a Fourth Amendment violation has occurred, the court conducts a three-step analysis assessing: (1) the nature of force inflicted; (2) the governmental interests at stake, which involve factors such as the severity of the crime, the threat posed by the suspect, and whether the suspect is resisting arrest (the "*Graham* factors*"); and (3) whether the force used was necessary. *Espinosa v. City & Cnty. of San Francisco*, 598 F.3d 528, 537 (9th Cir. 2010) (citing *Graham*, 490 U.S. at 396-97, and *Miller v. Clark Cnty.*, 340 F.3d 959, 964 (9th Cir. 2003)).

"The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396 (1989) (citing *Terry v. Ohio*, 392 U.S. 1, 20-22 (1968)). This is because "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97.

At the summary judgment stage, once the court has "determined the relevant set of facts and drawn all inferences in favor of the nonmoving party to the extent supportable by the record," the question of whether or not an officer's actions were objectively reasonable under the Fourth Amendment is a "pure question of law." *Scott*, 550 U.S. at 381 n.8. But an officer is not entitled to summary judgment if the evidence, viewed in the nonmovant's favor, could support a finding of excessive force. *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005). Because the excessive force balancing test is "inherently fact specific,

the determination whether the force used to effect an arrest was reasonable under the Fourth Amendment should only be taken from the jury in rare cases." *Green v. City and Cnty. of San Francisco*, 751 F.3d 1039, 1049 (9th Cir. 2014) (internal quotation marks omitted); *see Smith*, 394 F.3d at 701 (excessive force cases often turn on credibility determinations, and the excessive force inquiry "nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom") (quotation omitted).

## B. Discussion

### 1. Nature of the Force Inflicted

The parties dispute how long the dog bite lasted. Defendants do not specify how long the bite lasted, but dispute Plaintiff's contention that it was 88 seconds. The video submitted by the parties shows the dog bite began around 42 seconds into the video provided by Plaintiff and did not end until 1:31 seconds into the video, at the earliest, or approximately 50 seconds. The dog bite caused severe, permanently disfiguring injuries to Plaintiff's leg that have required multiple surgeries and extensive physical therapy to treat. Accordingly, drawing all inferences in Plaintiff's favor, the record shows that the forced used during Plaintiff's arrest was enough to cause severe physical injury, which must be justified by a similar level of "government interest [that] compels the employment of such force." *See Deorle v. Rutherford*, 272 F.3d 1272, 1280 (9th Cir. 2001).

### 2. Governmental Interest

In evaluating the government's interest in the use force, the Court considers the severity of the crime, the threat posed by the suspect, and whether the suspect resisted arrest or attempted to flee. *Miller*, 340 F.3d at 964. Here, it is undisputed that Plaintiff was a documented gang member, had prior felony convictions including aggravated assault, had recently been released from prison and absconded from community supervision, had an outstanding arrest warrant, was suspected of committing aggravated assault with a firearm the week before, and was suspected of committing a strong-arm robbery and an assault the day before his arrest. Moreover, Plaintiff fled when he saw the police, hid in a shed, and then climbed onto a roof. Based on these facts, the government's interest in apprehending

and arresting Plaintiff was high.

### 3. Necessity of Force

Finally, the Court must balance the force used against the need for such force to determine whether the force used was "greater than reasonable under the circumstances." *Espinosa*, 598 F.3d at 537 (quoting *Santos v. Gates*, 287 F.3d 846, 854 (9th Cir. 2002)). It is undisputed that Plaintiff initially fled when police arrived at the home and hid in a shed while they searched for him. What happened between the time police spotted Plaintiff on the roof and after the dog bite is disputed. Based on the video evidence, no reasonable jury could find that Plaintiff was attempting to comply with police orders to come down from the roof. Once he fell from the roof after being hit twice with a Taser, Plaintiff contends he was not resisting or refusing to put his hands out for handcuffing, but the video depicts otherwise. Plaintiff continued to struggle while on the ground before the K9 was deployed. In Defendants' request for admissions Plaintiff admitted he did not immediately comply with orders to put his hands behind his back. But the video evidence appears to show that the K9 continued to bite Plaintiff's leg for at least 12 seconds after Plaintiff was handcuffed and subdued. Based on the record evidence, there is a genuine issue of material fact whether the force used was greater than reasonable under the circumstances. Defendant Martin is not entitled to summary judgment on the merits of Plaintiff's claim in Count Three.

### C. Qualified Immunity

Defendants argue that, even if the Court finds a constitutional violation, Defendant Martin is entitled to qualified immunity.

### 1. Legal Standard

Government officials are entitled to qualified immunity from civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Officials are not entitled to qualified immunity if "(1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at

the time.'" *District of Columbia v. Wesby,* — U.S. —, 138 S. Ct. 577, 589 (2018) (quoting *Reichle v. Howards,* 566 U.S. 658, 664, (2012)). Courts may address either prong first, depending on the circumstances in the particular case. *Pearson v. Callahan*, 555 U.S. 223, 230–32, 235-36 (2009).

For a right to be clearly established there does not have to be a case directly on point; however, "'existing precedent must have placed the statutory or constitutional question beyond debate.'" *White v. Pauly*, — U.S. —, 137 S. Ct. 548, 551 (2017) (quoting *Mullenix v. Luna*, — U.S. —, 136 S. Ct. 305, 308 (2017)). Accordingly, a right is clearly established when case law has been "earlier developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that what he is doing violates federal law." *Shafer v. Cnty. of Santa Barbara*, 868 F.3d 1110, 1117 (9th Cir. 2017) (citing *White*, 137 S. Ct. at 551). To determine whether qualified immunity applies, the court must first identify the federal or constitutional right at issue; then it must attempt to "identify a case where an officer acting under similar circumstances as [the defendant] was held to have violated" that right. *Id.* If there is no such case, then the right was not clearly established, and the officer is protected from suit. *See id.* at 1117-18. "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (internal citations omitted).

### 2. Discussion

Because the Court has already determined that there is a question of fact whether Defendant Martin violated Plaintiff's Fourth Amendment rights, the qualified immunity analysis turns on whether the right at issue in this case was clearly established at the time Plaintiff's claim arose.

Defendants argue that at the time of Plaintiff's arrest,

> No case law addresses a factual scenario where a suspect high
> on methamphetamines, who was fleeing from a lawful arrest
> through neighboring back yards was finally cornered on the

1
2
3

> roof of an occupied home and out of officers' reach, refuses to comply with orders, jumps or falls down from the roof, and engages in a fight with officers requiring use of a police K9 to effectuate his arrest.

4   (Doc. 106 at 16.)

5       Defendants' characterization of the right at issue is too narrow.  At the time of
6   Plaintiff's arrest, the Ninth Circuit Court of Appeals had clearly established that using
7   unnecessary force against a handcuffed, non-resistant arrestee could amount to excessive
8   force.  *See Guy v. City of San Diego*, 608 F.3d 582, 589 (9th Cir. 2010) ("even when police
9   officers reasonably must take forceful actions in response to an incident . . . if the officers
10  go too far by unnecessarily inflicting force and pain after a person is subdued, then the
11  force . . . can still be considered excessive"); *see also Mendoza v. Block*, 27 F.3d 1357,
12  1362 (9th Cir. 1994) (holding that the law was clearly established for qualified immunity
13  purposes "for a deputy to know that excessive force has been used when a deputy sics a
14  canine on a handcuffed arrestee who has fully surrendered and is completely under
15  control").  In addition, Plaintiff cites *Watkins v. City of Oakland, Cal*., 145 F.3d 1087
16  (9th Cir. 1998), in which a police officer allowed his dog to continue biting the plaintiff
17  who was recoiling from the dog's bite and could not immediately comply with orders to
18  show his hands due to the pain of the dog's attack.  The Ninth Circuit Court of Appeals
19  affirmed the district court's denial of qualified immunity to the officer, holding that "it was
20  clearly established that excessive duration of the bite and improper encouragement of a
21  continuation of the attack by officers could constitute excessive force that would be a
22  constitutional violation."  *Id*. at 1093.  In an unpublished memorandum decision filed on
23  April 21, 2020, the Ninth Circuit cited *Watkins*, finding "pre-existing law gave [the officer]
24  fair warning that it would be unlawful to use a canine in a prolonged manner . . . ." *Hartsell
25  v. Cnty. of San Diego*, —F. App'x—, 2020 WL 1923706, at *1 (9th Cir. April 21, 2020).

26      These cases apply to the conduct at issue here where, assuming the evidence in a
27  light most favorable to Plaintiff, even after Plaintiff was handcuffed and the video appears
28  to show he was subdued, the K9 was allowed to continue biting Plaintiff for another 12

seconds. *See Wilkins v. City of Oakland*, 350 F.3d 949, 956 (9th Cir. 2003) ("Where the officers' entitlement to qualified immunity depends on the resolution of disputed issues of fact in their favor, and against the non-moving party, summary judgment is not appropriate"). No reasonable officer could have believed that it was lawful to use a K9 to continue to bite a suspect after he was handcuffed and lying still. Accordingly, Defendant Martin is not entitled to qualified immunity as to Count Three.

Because there are material disputed issues of fact whether Defendant Martin's use of force was reasonable under the circumstances, the Court will deny Defendants' Motion for Summary Judgment as to Count Three.

**V.    State Law Claims**

Defendants argue that the State is entitled to qualified immunity and statutory immunity on Plaintiff's state law claims in Counts One, Three and Four. (Doc. 105 at 17.)

**A.    State Law Qualified Immunity.**

In *Chamberlain v. Mathis*, the Arizona Supreme Court held that "qualified immunity protects government officials from liability for acts within the scope of their public duties unless the official knew or should have known that he was acting in violation of established law or acted in reckless disregard of whether his activities would deprive another person of their rights." 729 P.2d 905, 912 (Ariz. 1986). Although it is a question of law whether a defendant is entitled to immunity, "[w]hen the existence of immunity depends on disputed factual issues, a jury must resolve those issues before the court may decide whether the facts are sufficient to establish immunity." *Pinal Cnty. v. Cooper* 360 P.3d 142, 146 (Ariz. Ct. App. 2015) (citing *Chamberlain*, 720 P.2d at 905).

Defendants argue that under this standard they are immune "if they could have formed a reasonable belief that the use of K9 Storm to arrest Plaintiff was constitutional." (Doc. 105 at 18.) Plaintiff responds that Defendants are not entitled to qualified immunity under state law because there are disputed factual issues which must first be resolved by a jury. (Doc. 114 at 20-21.)

The Court agrees with Plaintiff that, at this stage and when considering the evidence in the light most favorable to Plaintiff, there are disputed issues of material fact precluding summary judgment on the basis of qualified immunity under Arizona law.

**B.    State Law Statutory Immunity**

Defendants also argue they are entitled to statutory immunity, citing a recent Arizona Supreme Court decision which held that "statutory presumptions are triggered when a law enforcement officer intentionally uses physical force to arrest or capture a suspect and the suspect is injured." *Ryan v. Napier*, 425 P.3d 230, 237 (Ariz. 2018) (citing Ariz. Rev. Stat. §12-716(A)(1).  The statute cited provides:

> If the court finds by a preponderance of the evidence that a plaintiff is harmed while the plaintiff is attempting to commit, committing or fleeing after having committed or attempted to commit a felony criminal act or if a person intentionally or knowingly caused temporary but substantial disfigurement or temporary but substantial impairment of any body organ or part or a fracture of any body part of another person, the following presumptions apply to any civil liability action or claim:
>
> 1. A victim or peace officer is presumed to be acting reasonably if the victim or peace officer threatens to use or uses physical force or deadly physical force or a police tool product to either:
>
> > (a) Protect himself or another person against another person's use or attempted use of physical force or deadly physical force.
>
> > (b) Effect an arrest or prevent or assist in preventing a plaintiff's escape.

Ariz. Rev. Stat. § 12-716(A)(1).

Defendants argue that because Plaintiff was injured while fleeing from police and resisting arrest and was suspected of having recently committed two serious violent felonies, then Defendant Martin and all officers who assisted in Plaintiff's arrest are presumed to have acted reasonably and Plaintiff's state law claims fail.  (Doc. 105 at 19.) Plaintiff responds that Arizona Revised Statutes § 12-716 only applies when a person is

fleeing and "no reasonable inference supports the notion Plaintiff was fleeing at the time he was bitten by Storm." (Doc. 114 at 22.)

Defendants argue that they are further shielded from liability by Arizona Revised Statutes § 13-409, which provides that a person is justified in using physical force against another during an arrest if all of the following exist:

> 1. A reasonable person would believe that such force is immediately necessary to effect the arrest or detention or prevent the escape.
>
> 2. Such person makes known the purpose of the arrest or detention or believes that it is otherwise known or cannot reasonably be made known to the person to be arrested or detained.
>
> 3. A reasonable person would believe the arrest or detention to be lawful.

Ariz. Rev. Stat. § 13-409. "If the officer's use of force is justified under § 13-409, the officer is immune from civil liability. *Ryan*, 245 Ariz. at 63 (citing Ariz. Rev. Stat. § 13-413).

Defendants argue that Martin's use of force was justified because he was using Storm to subdue and arrest Plaintiff, whom Martin believed might be armed; Plaintiff was struggling with officers attempting to handcuff him and refusing commands first to get off the roof and then to stop resisting; lower levels of force proved futile; Plaintiff knew the purpose of the arrest; and Martin had an arrest warrant for Plaintiff, thus reasonably believing the arrest was lawful. (Doc. 105 at 20.)

Plaintiff responds that § 13-409 only applies if a "reasonable person" would believe the force is "immediately necessary to effect the arrest" of a suspect, and that "a reasonable person could conclude that the use of Storm was not immediately necessary to effect Plaintiff's arrest." (*Id*. at 22-23, citing *Weekly v. City of Mesa*, 888 P.2d 1346 (Ariz. Ct. App. 1994).) In *Weekly*, the plaintiff sued under Arizona's strict liability dog bite statute for injuries he received from a police dog bite. 888 P.2d at 161. The Arizona Court of Appeals determined that while Arizona Revised Statutes §§ 13-409 and 13-413 provided a

basis for the City to defend against civil liability for the plaintiff's claim, the city needed to establish:

> (1) the dog was used as physical force against plaintiff during the course of making or assisting in an arrest or detention or preventing an escape after arrest or detention; (2) a reasonable person would believe that the use of the dog as such force was immediately necessary to effect the arrest or detention or to prevent the escape; (3) the person using the dog had made known to plaintiff the purpose of the arrest or detention or believed that it was otherwise known or could not reasonably be made known to plaintiff; and (4) a reasonable person would believe plaintiff's arrest or detention to be lawful.

*Id*. at 166.

When considering the evidence in the light most favorable to Plaintiff, there are disputed issues of material fact precluding summary judgment on Plaintiff's state law claims on the basis of Arizona's justification statutes. Accordingly, the Court will deny summary judgment as to Plaintiff's state law vicarious liability claims against the State in Counts One, Two and Four.[5]

**IT IS ORDERED:**

(1)     The reference to the Magistrate Judge is withdrawn as to Defendants' Motion for Summary Judgment (Doc. 105).

(2)     Defendants' Motion for Summary Judgment (Doc. 105) is **denied**.

(3)     This action is referred to Magistrate Judge Camille D. Bibles to conduct a settlement conference as to Plaintiff's claims against Defendants.

. . . .

. . . .

. . . .

. . . .

. . . .

---

[5] Defendants do not move for summary judgment on the merits of Plaintiff's state law claims.

(4)     Counsel shall jointly call Magistrate Judge Bible's chambers at 928-774-2566 within 14 days to schedule a date for the settlement conference.

Dated this 30th day of April, 2020.

_____
Susan R. Bolton
United States District Judge